# In the United States Court of Federal Claims

No. 11-783C
**Filed: August 21, 2014**
**Reissued: September 17, 2014[1]**

* * * * * * * * * * * * * * *   *

**ERIC F. ADAMS,**                                          *

              **Plaintiff,**          *

              **v.**          *

**UNITED STATES,**                                          *

              **Defendant.**          *

* * * * * * * * * * * * * *   *

|   |
|---|
| **Military Pay; Motion for Judgment on the Administrative Record; 10 U.S.C. § 1201; 10 U.S.C. § 1216a; Department of Veterans Affairs Schedule for Rating Disabilities (VASRD); 38 C.F.R. Part 4; 38 C.F.R. § 4.124a.** |

**Barton F. Stichman**, National Veterans Legal Services Program, Washington, D.C., for plaintiff. With him were **Thomas A. Moore**, National Veterans Legal Services Program, **Noelle J. Coates**, Hunton & Williams LLP, Washington, D.C., and **Shannon E. Fyfe**, Hunton & Williams LLP.

**Richard P. Schroeder**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were **Stuart F. Delery**, Assistant Attorney General, Civil Division, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, Civil Division, and **Scott D. Austin**, Deputy Director, Commercial Litigation Branch, Civil Division, **Major Mary E. Meek**, Department of the Army, Litigation Division, Fort Belvoir, Virginia, of counsel.

## O P I N I O N

<u>**HORN, J.**</u>

Plaintiff, Eric F. Adams, filed suit in the United States Court of Federal Claims claiming that he "has been denied the disability retirement pay and benefits to which he is entitled under 10 U.S.C. § 1201 as a result of the Army's erroneous application of the VASRD [Veterans Affairs Schedule for Rating Disabilities]." Plaintiff seeks to vacate the

---

[1] This opinion was issued under seal on August 21, 2014. The parties were given the opportunity to propose possible redactions, but no redactions were proposed. The original opinion is hereby unsealed and reissued without redaction.

2005 "decision of the Army to assign Plaintiff a disability rating of less than 30% for his unfitting disability of migraine headaches," and the 2011 "decision by the Secretary of the Army to reject the PDBR [Physical Disability Board of Review] majority recommendation" to raise plaintiff's disability rating for his "Post-Concussive Migraine Headaches" from ten percent to thirty percent. He seeks to vacate both decisions as "unsupported by substantial evidence, arbitrary and capricious, and contrary to law." Plaintiff also seeks (1) money damages, (2) a correction to his records to reflect the thirty percent rating for his migraine condition, (3) interest, costs, and attorneys' fees, and (4) other relief as the court deems just and proper.

## FINDINGS OF FACT

According to the parties' joint stipulation of facts, "Staff Sergeant Eric Adams began his military service in the United States Army Reserves in November 1985, serving at various times in both an active and reserve status until his honorable discharge from the Reserves in December 1994." The record indicates that during this time plaintiff served one year, one month, and four days in active service in the role of military police during the first Gulf War. Plaintiff reenlisted in the Army Reserves on May 1, 2001, for a three-year term. The parties jointly stipulated that on July 24, 2003, while deployed in Kuwait, "Mr. Adams was injured in a motor vehicle accident during a dust storm in which Mr. Adams reported his vehicle was hit from behind at a relatively high speed." The parties stipulated "that the collision tossed him into the ceiling of the vehicle," and the record further indicates that plaintiff hit his head on the ceiling of the vehicle, although he did not lose consciousness. According to the parties' joint stipulation, "Mr. Adams reported that there were no seat belts in the vehicle." The parties also stipulated: "The line of duty investigation into the accident concluded that Mr. Adams sustained a head and neck injury while in the line of duty when the van in which he was a passenger was hit by a tractor trailer in Kuwait."[2]

The record before the court further indicates that after the accident, plaintiff was taken for treatment to the 47th Combat Support Hospital in Camp Wolf, Kuwait, where he complained of head and neck pain. Shortly thereafter, he was evacuated from Kuwait and sent to Landstuhl Regional Medical Center in Germany for further evaluation and treatment. Three days after the accident, on July 27, 2003, an "AEROMEDICAL EVACUATON PATIENT RECORD" indicated that plaintiff complained of a headache with the pain measuring a seven out of ten. (capitalization in original). On July 28, 2003, when examined in Landstuhl, Germany, the handwritten medical records appear to state plaintiff was diagnosed with a "Concussion," along with "Head Muscle Strain." Plaintiff additionally reported at that time that he was suffering from migraine headaches.

---

[2] Defendant has not contested whether plaintiff's medical condition resulted from the July 24, 2003 accident.

According to the parties, one day later, "[b]y orders dated July 29, 2003, Mr. Adams was reassigned to Fort Stewart, Georgia, for continued medical care to recover from his physical injuries." The record indicates that on August 4, 2003, at Fort Stewart, Colonel Josephine W. Session, a medical doctor, diagnosed plaintiff with "Post traumatic Headache Syndrome."[3] The record further indicates that plaintiff was examined by certified physician assistant Keith E. Williamson at Fort Gordon on August 7, 2003. Mr. Williamson listed "Head Injury" and "Persistent Asthma" under "Impression" in his report. (emphasis in original). The parties also jointly stipulated that Colonel John H. Brooks, a medical doctor, subsequently "conducted a medical examination of Mr. Adams at Fort Stewart, Georgia on August 25, 2003 and diagnosed Mr. Adams with a 'migraine headache' due to 'auto accident with concussion.'"

On September 11, 2003, Jerry L. Vander Heyden, a doctor of chiropractic medicine, working at the Winn Army Community Hospital in Fort Stewart, diagnosed plaintiff with "OCCIPITAL NEURAGIA [sic]," "POST TRAUMATIC HEADACHES," and "ACUTE CERVICAL STRAIN/SPRAIN." (capitalization in original). Plaintiff stated to Dr. Vander Heyden that his headaches were "FREQUENT," "THROBBING," and that they began "IN THE BASE OF THE SKULL AND RADIATE INTO THE RIGHT SIDE OF HIS HEAD AND OVER THE EYES." (capitalization in original). Plaintiff also stated to Dr. Vander Heyden that bright lights affect his eyes, and that "he has had episodes of dizziness and vomiting as well." According to the report by Dr. Vander Heyden, however, "HE HAS HAD A CTSCAN [computerized tomography scan] OF HIS HEAD WHICH WAS REPORTED TO BE NORMAL." (capitalization in original). On October 1, 2003, Major Umesh S. Marathe, a medical doctor, examined plaintiff at Fort Stewart's Ear, Nose, and Throat Clinic, and stated in his examination report that plaintiff experienced headaches and a concussion resulting from trauma. Dr. Marathe assessed plaintiff with "MiGraiNe." (capitalization as in original). Plaintiff was prescribed medicine to manage his migraine headaches during this period. The parties jointly stipulated that while at Fort Stewart, on October 21, 2003, First Lieutenant Elizabeth VanHemel, a certified physician assistant, assessed plaintiff, and "diagnosed Mr. Adams with 'migraine headache' and 'post-concussive syndrome.'" According to the parties, First Lieutenant VanHemel noted that plaintiff "'fe[lt] like his migraine [was] about to start' but that he was not 'photophobic' and had no 'vertigo.'" (modifications in original).

A Department of the Army (DA) Form 3349, "PHYSICAL PROFILE" report,[4] signed by Dr. Session, an Army physician, on November 4, 2003, indicated

---

[3] The phrase "Post traumatic Headache Syndrome" follows the letter "A" in the notes taken by the physician, which appears to indicate "Assessment."

[4] The DA Form 3349 is part of the Army's physical profiling system, which is used to determine whether a physical condition has temporarily or permanently affected a soldier's ability to perform his or her military duty. See Army Reg. 40-501, Ch. 7 (Apr. 12, 2004 Rev.); see also 5 C.F.R. § 339 (2005).

"MIGRAINE" as plaintiff's "MEDICAL CONDITION." (capitalization in original). This report recommended that plaintiff not be deployed because of his injury.[5] On a November 6, 2003 sick call for neck and shoulder pain at Fort Stewart, Eric Treaster, the treating physician assistant, assessed plaintiff with migraines, and filed a medical report indicating "Migraines" as one of plaintiff's medical conditions, along with "DDD $Cy-C_6$," which appears to refer to a spinal injury. According to the parties, on November 18, 2003 Major Jason Friedman, a neurologist, evaluated plaintiff at Fort Stewart's Eisenhower Medical Center and diagnosed him with "migraines." The parties jointly stipulated that "Dr. Freidman states in his report that Mr. Adams '[complained of] migraines since accident 24 July 03' starting in the frontal area with nausea, vomiting, photophobia, phonophobia, and that these symptoms were relieved with 'midrin and rest, cold compress.'" (modification in original). The parties further jointly stipulated: "The report also reflects that Mr. Adams reported to Dr. Friedman that he had migraines 'at least once a [week]' that 'last until he goes [to sleep],' with an intensity of 8-9 out of 10." (modifications in original). The record also indicates that another physical profile report was completed on November 24, 2003, this time by Dr. Brooks, which listed "ASTHMA. MIGRAINE HEADACHE. HEARING LOSS. DEGENERATIVE DISK [sic] DISEASE. LEFT PLANTAR FASCITIS [sic]" as plaintiff's "MEDICAL CONDITION." (capitalization in original). When visiting Dr. Vander Heyden on December 8, 2003, plaintiff again reported: "Migraine, 2 Headaches LAST weeks," along with tinnitus, but indicated that the migraines were controlled with medication. First Lieutenant Kim Walker, another physician assistant, examined plaintiff on February 10, 2004 and diagnosed him with "migraine HA's [headaches] – controlled." On April 19, 2004, Colonel Lynn F. Abrams filed a physical profile report, which also listed migraines as one of Mr. Adams' medical conditions. Both parties stated in their briefs that at no point did the evidence demonstrate that plaintiff suffered from memory loss or memory impairment.

Plaintiff was evaluated by Dr. Thomas R. Byrnes at the Winn Army Community Hospital, Fort Stewart, Georgia, on April 22, 2004. The parties jointly stipulated regarding the April 22, 2004 visit: "Dr. Thomas Byrnes examined Mr. Adams for the Military Evaluation Board ('MEB') to evaluate his medical condition." The parties further stipulated that plaintiff told Dr. Byrnes that he suffered from "daily headaches . . . with occasional exacerbations. . . [sic] for which he takes Percocet when [the pain] is severe." (modifications in original). The report by Dr. Byrnes gave the following diagnosis: "Chronic neck pain with degenerative disc disease and a cervical herniated nucleus pulposus, debilitating migraine headaches, plantar fasciitis, left plantar fasciitis. Sensory neural hearing loss with tinnitus, medically acceptable, and asthma, medically

---

[5] Although only the physical profile report filed on November 4, 2003, specifically recommended that plaintiff not be deployed, two later physical profile reports in the record, dated November 24, 2003 and April 19, 2004, substantially limited plaintiff's duties within the Army, for example, by preventing plaintiff from "WEAPON[S] FIRING," and limiting his ability to lift heavy objects, perform strenuous activity, or be in areas with loud noise. (capitalization in original).

acceptable." The parties jointly stipulated: "The doctor's narrative summary states that the migraines occur 'weekly' and require Mr. Adams 'to leave his duty station, take medication and rest in a darkened room.'" The report also indicated that Dr. Byrnes recommended Mr. Adams be sent "to the Physical Evaluation Board for further adjudication."

Additionally, the parties jointly stipulated that "[o]n May 3, 2004, the Medical Evaluation Board convened to evaluate plaintiff's medical condition." The May 3, 2004 MEB, according to the parties, "determined that Mr. Adams fell below Army medical fitness standards for retention for a number of reasons, including 'debilitating migraine headaches,' and referred his case to a Physical Evaluation Board." The parties also jointly stipulated that, one day later, on May 4, 2004, "Mr. Adams concurred with the Medical Evaluation Board's findings and recommendations," and the record indicates that plaintiff signed a DA Form 3947 (Mar. 1983 Rev.), marking the box, "I agree with the board's findings and recommendation."

According to the parties' joint stipulation, "[o]n May 5, 2004, an informal Physical Evaluation Board ('PEB') reviewed Mr. Adams's medical history." As indicated jointly by the parties, the 2004 informal PEB concluded that plaintiff's "'medical and physical impairment prevent[ed] the reasonable performance of duties required by grade and military specialty.'" (modification in original). The record indicates that the 2004 informal PEB assigned plaintiff a disability rating of thirty percent, based on the following:

(a) 20 percent for "LEFT C5-6 RADICULOPATHY WITH PAIN PARESTHESIAS AND SENSORY IMPAIRMENT" under the analogous Department of Veterans Affairs ("VA") Schedule for Rating Disabilities ("VASRD") Diagnostic Codes 8599, 8513 under the VASRD diagnostic codes (DCs) 8599-8513[6];

(b) 10 percent for "C4-5 HERNIATED NUCLEUS PULPOSUS WITH COMBINED CERVICAL RANGE OF MOTION OF 305 DEGREES" under VASRD Diagnostic Code 5243 ["Intervertebral disc syndrome." 38 C.F.R. § 4.71a (2003)];

(c) zero percent for "MIGRAINE HEADACHES, NOT REQUIRING PROPHYLACTIC THERAPY, NOT CONSIDERED PROSTRATING"

---

[6] DC 8599-8513 represents the pairing of two diagnostic codes in the VASRD, DC 8599, representing an unknown "DISEASE[] OF THE PERIPHERAL NERVES," rated analogously to DC 8513, representing "Mild" paralysis of "**[a]ll radicular groups**." See 38 C.F.R. § 4.124a (2003) (capitalization and emphasis in original).

under VASRD Diagnostic Code 8910 ["Migraine." 38 C.F.R. § 4.124a (2003).[7]]

(capitalization in original).

The 2004 informal PEB determined that plaintiff's injuries were "not sufficiently stable for final adjudication," and recommended that plaintiff be "[p]laced on temporary disability retired list with reexamination during JUN, 2005." According to the parties, a PEB liaison officer, Robert E. King, explained the "findings and recommendations" of the 2004 informal PEB review to plaintiff, and Mr. Adams' "legal rights pertaining thereto." Thereafter, on May 11, 2004, "Mr. Adams concurred with" the 2004 informal PEB's "findings and recommendations and waived a formal hearing of his case," and the record indicates that plaintiff signed a DA Form 199 (Jun. 1997 Rev.) and marked, "I CONCUR AND WAIVE A FORMAL HEARING OF MY CASE." (capitalization in original). The parties stipulated that "[i]n July 2004, Mr. Adams was released from active service and placed on the TDRL [Temporary Disability Retired List]." The record contains a "CERTIFICATE OF RELEASE OR DISCHARGE FROM ACTIVE DUTY," listing a "Separation Date This Period" of July 1, 2004, and listing the type of separation as "RETIREMENT." (capitalization in original).

After plaintiff was placed on the TDRL, the parties stipulated that plaintiff applied to the Department of Veterans Affairs (VA) "for service-connected disability compensation" on August 3, 2004.[8] According to the parties' joint stipulation, "[o]n September 1, 2004, the VA issued its first rating decision addressing Mr. Adams's migraines," and assigned plaintiff a fifty percent disability rating for migraines under DC 8100, "Migraine." In their joint stipulation, the parties noted that the VA concluded that plaintiff's migraines were "'very frequent, completely prostrating, and prolonged attacks productive of severe economic inadaptability.'" The September 1, 2004 VA report

---

[7] In the actual May 5, 2004 informal PEB record, plaintiff's migraines condition was indicated as rated under DC "8910," which represents "Epilepsy, grand mal." 38 C.F.R. § 4.124a (2003). Both the later October 24, 2005 informal PEB and July 7, 2011 PDBR concluded that this rating was an error. The October 24, 2005 informal PEB noted: "Headaches incorrectly rated in May 2004." The 2011 PDBR majority decision stated: "It is clear that the 8910 (epilepsy) code entered on the PEB's DA Form 199 for TDRL [Temporary Disability Retired List] placement was erroneous, probably typographically so. A 0% rating was conferred at that time with documentation on the DA Form 199 that the headaches were 'not considered prostrating;' so, it may be assumed that the rating criteria in mind were those attendant to code 8100 (migraine)."

[8] Previously, on August 26, 2003, according to the record, plaintiff signed a "PHYSICAL EVALUATION BOARD (PEB) FACT SHEET," stating that he understood the rules and guidelines of disability ratings, including that, "[t]he Army is not bound by the VA ratings nor is the VA bound by the Army's ratings." (capitalization in original).

stated: "We have assigned an effective date of July 2, 2004, the first day following your discharge from the military."

The parties have jointly stipulated that, "[a]s a service member who has been placed on the TDRL, Mr. Adams was required to undergo a periodic medical examination -at least every 18 months followed by a reevaluation by a PEB to determine whether his impairments changed to any meaningful degree." (citing 10 U.S.C. § 1210; Army Reg. 635-40, Ch. 7-4 (Aug. 15, 1990 Rev.)). While on the TDRL, between his 2004 and later 2005 informal PEB reviews, plaintiff was evaluated on July 18, 2005 by Major Elizabeth L. Garcia, a neurologist, at the Dwight David Eisenhower Army Medical Center at Fort Gordon, Georgia. According to the parties:

> Dr. Garcia stated, in her medical report, that Mr. Adams reported that he was experiencing "one to two" migraine headaches per week with a "duration of less than 24 hours"; that the headaches "interfere[d] with his quality of life and ability to work"; but that the headaches were "[l]ess intense than when he first had them."

(modifications in original). According to the parties, "Mr. Adams reported to Dr. Garcia that 'he gets visual aura with the headaches' and that the headaches caused photophobia, visual scotomata, and nausea, but no vomiting." The parties stipulated that "Dr. Garcia diagnosed plaintiff with 'CLASSICAL MIGRAINE (WITH AURA): intractable with 1-2 prostrating headaches a week' and found him '[n]ot fit for duty' pursuant to Army Regulation 40-501, paragraph 3-30(g)." (capitalization in original). Dr. Garcia also noted that plaintiff was not suffering from any mental disability, and was working as a "'VA police officer.'"

In addition, as part of his TDRL review, plaintiff was examined on August 20, 2005 by Captain Tran, an orthopedic specialist, again at the Dwight David Eisenhower Army Medical Center. Dr. Tran's examination was not related to Mr. Adams' migraine complaints. Instead, Dr. Tran explored whether there was a relationship between plaintiff's "neck pain and decreased range-of-motion," and his "herniated nucleus pulposus," for which he had been given a ten percent disability rating in his May 3, 2004 informal PEB review. Dr. Tran concluded that Mr. Adams' "magnetic resonance imaging scan findings of a herniated nucleus pulposus without any symptoms on physical examination is highly unlikely for his cause of his neck pain and decreased range-of-motion," and that the patient was stable.

Plaintiff was given an opportunity to agree or disagree with the TDRL evaluation, conducted by Doctors Tran and Garcia, in a memorandum dated September 1, 2005. According to the memorandum, plaintiff had the option to agree with the evaluation and concur with the phrase: "I have read the TDRL evaluation and agree with the findings and recommendations." Alternatively, he could have disagreed with the findings and filed an appeal by marking: "I have read the TDRL evaluation and I disagree with the findings and recommendations. My written appeal is attached." Plaintiff chose the

second option and included a notation above his signature, which stated, "NEED REASONABLE AMOUNT OF TIME TO REPLY, HAVE APPTS." (capitalization in original). There is no evidence in the record, however, that plaintiff ever provided further information.

On October 13, 2005, plaintiff was notified, in a memorandum from Colonel Martin I. Reyes, president of the Army PEB, that plaintiff's upcoming PEB proceedings had been postponed due to a request for more information. The memorandum stated:

> Physical Evaluation Board proceedings pertaining to the above named Soldier are discontinued for the following reasons: Please provide the documentation that Soldier was receiving prophylaxis for his headaches as described in the 18 July 2005 Neurology Note. The medication profile shows that he received no medications from 18 November 2003 until 18 July 2005, the date of his neurology evaluation. Please provide medication profiles supporting the TDRL evaluation.

The memorandum added that "[i]f the information or documentation is not provided to the PEB within 60 days, the case will be terminated." Documents in the record suggest that plaintiff was prescribed and taking medication for his migraine headaches in October and November of 2003, and was again prescribed medication for his migraine headaches running from October of 2004 through December of 2005.

According to the parties' joint stipulation, a "second informal PEB convened on October 24, 2005 to review Mr. Adams's medical condition." The 2005 informal PEB rated plaintiff differently than the prior 2004 informal PEB had done, both in rating percentage and with respect to the causes of plaintiff's disabilities. The disability ratings assigned by the 2005 informal PEB are summarized from the record as follows:

(a) 10 percent for "CERVICAL DISC HERNIATION, WITHOUT NEUROLOGIC ABNORMALITY" under DC 5243, "Intervertebral disc syndrome." 38 C.F.R. § 4.71a (2005);

(b) 10 percent for "POSTCONCUSSIVE MIGRAINE HEADACHES" under DC 8045-9304, which, as discussed more below, represents "Brain disease due to trauma" rated analogously to "Dementia due to head trauma." See 38 C.F.R. §§ 4.124a, 4.130 (2005).

The 2005 informal PEB did not assign plaintiff a disability rating for his "LEFT C5-6 RADICULOPATHY" or his "C4-5 HERNIATED NUCLEUS PULPOSUS," as the 2004 informal PEB had done, nor did the 2005 informal PEB utilize VASRD DC 8100, titled "Migraine," to rate plaintiff's post-concussive migraine headaches. (capitalization in original). Instead, the 2005 informal PEB chose to rate plaintiff's migraines under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma." The 2005 informal PEB, referencing Dr. Garcia's TDRL evaluation, stated:

"NARSUM [narrative summary] indicated 24 July 2003 MVA [motor vehicle accident] and subsequent diagnosis of postconcussive syndrome. Currently rated IAW [in accordance with] VASRD note under DC 8045 ['Brain disease due to trauma']." As indicated jointly by the parties, the total resulting disability rating granted by the 2005 informal PEB was twenty percent, which left plaintiff eligible to be medically separated from the Army, but not retired on disability. As stipulated to by the parties, the 2005 informal PEB also decided that plaintiff's condition was "'sufficiently stable for final adjudication.'"

The parties jointly stipulated that "[t]he Army provided Mr. Adams with the PEB's findings and recommendations." According to the record, and the parties' joint stipulation, "Mr. Adams did not submit an appeal or otherwise submit an election regarding the 2005 informal PEB decision," within the applicable time limits, and, as a result, his case was forwarded to the Army Physical Disability Agency for final determination on November 17, 2005.[9] As indicated in the record, on November 21, 2005, the Army Physical Disability Agency approved the 2005 informal PEB's recommendation, removed plaintiff from the TDRL, and discharged him from the Army. The parties stipulated that "Mr. Adams thereafter was provided a one-time lump sum disability severance payment." The Army issued the following order:

> You are removed from the Temporary Disability Retired List and discharged from the service on the date indicated because of permanent physical disability.
>
> Effective date: 21 Nov 05
> Percentage of disability: 20%
> Additional instructions: You are entitled to severance pay provided you have completed over 6 months of service.

BY ORDER OF THE SECRETARY OF THE ARMY:

---

[9] Included in the record is a November 17, 2005 memorandum from Colonel Reyes to "CDR [Commander], U.S. Army Physical Disability Agency," discussing plaintiff's "Failure to Elect." The memorandum stated in full:

> 1.   **SSG [Staff Sergeant] Eric F. Adams, 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** has received the findings and recommendations of the informal board dated **24 October 2005** on **27 October 2005**, verified per attached FedEx proof of delivery, tracking number 792420905764.
>
> 2.   Since the soldier has failed to make an election within the prescribed time limits, the case is forwarded in accordance with paragraph AR 635-40, para 7-20e for further processing.

(emphasis in original).

(capitalization in original).

Thereafter, plaintiff continued to receive benefits from the VA, based on the VA's earlier September 1, 2004 rating decision. Plaintiff "filed a claim for increased evaluation, a re-opened claim, and a new claim that was received on December 20, 2006." The VA came to a new disability rating decision on October 26, 2007. As part of the VA's October 26, 2007 rating decision, the VA "proposed decreasing its rating of Mr. Adams's migraine condition [previously awarded September 1, 2004] from 50 percent disabling to 10 percent," based on "a thorough review of your outpatient treatment records which fail[ed] to confirm any treatment for completely prostrating and prolonged headaches over the past year which caused severe economic inadaptability." The October 26, 2007 VA rating decision also stated:

> In November, 2005, you were routinely evaluated for headache treatment and were noted to be "in no acute distress." Seen again in March, 2006, for migraine management you were again described as being in "no acute distress." In July, 2006, you were found to be in a "functional status" and in "no acute distress." You presently take medications to reduce the frequency and severity of migraine headaches. At your VA compensation and pension examination you reported that headaches had become worse and that they are more frequent. You described your headaches as occurring "weekly." Physical examination was unremarkable.

The VA decision explained: "Prostrating attacks of headache are episodes of acute signs and symptoms severe enough to cause extreme weakness and incapacitation which require bed rest and treatment by a physician. The evidence of record fails to establish a current history of migraine headaches which meet this criteria." In the October 26, 2007 rating decision, the VA also proposed to increase plaintiff's disability rating for "cervical disc disease, C4 to C6," from ten percent to twenty percent, and maintain plaintiff's other disability ratings for his "chronic adjustment disorder," "left C5-6 radiculopathy," "labrynthitis," "tinnitus," and "asthma." The record before the court is not clear, however, it appears that plaintiff's fifty percent disability rating related to his migraine headaches, awarded on September 1, of 2004, was not actually reduced.

The record before the court reflects that on November 15, 2007 plaintiff requested a formal hearing to contest the reduction in migraine-related benefits suggested earlier by the VA. On March 13, 2008 the VA received from plaintiff a summary of leave requests, showing "many requests for sick leave due to headaches." According to the record, plaintiff filed another "claim for increased evaluation" with the VA on June 19, 2008. The VA issued another rating decision on December 15, 2008, in which the VA continued plaintiff's disability ratings related to his shoulder and neck pain, and vertigo, however, the VA did not address Mr. Adams' disability rating for his

migraine condition.[10] On September 17, 2009, the VA issued another rating decision, stating that "[s]ince our last review of your claim, we received additional evidence on March 13, 2008," related to Mr. Adams' migraine condition. The September 17, 2009 VA rating decision included the following determination: "Evaluation of migraines, which is currently 50 percent disabling, is continued." Plaintiff's September 17, 2009 VA rating decision also stated in its explanation:

> Rating decision of October 26, 2007, proposed to reduce your benefits. We sent you a letter on November 2, 2007, notifying you of the proposed reduction. You had 60 days to submit additional evidence or 30 days to request a hearing.

> On November 15, 2007, we received your request for a hearing prior to reduction in benefits.

> Summary of leave requests, received March 13, 2008, shows many requests for sick leave due to headaches.

> Review of VAMC [Veteran's Administration Medical Center] records, James A. Haley Veteran's Administration Medical Center, Tampa, from April 25, 2008 through June 24, 2009, shows that you report headache frequency of once or twice per week on average. You have used propranolol, depakote, Imitrex, and Botox for headache prophylaxis with varied results. You report decreased headache frequency with Botox, however, results last less than a month. Records show that most of your headaches are prostrating and last up to 24 hours, causing you to miss many days of work.

---

[10] The parties have stipulated:

> Mr. Adams's VA rating decision dated December 15, 2008, does not address Mr. Adams' migraine condition, but the VA rating decision dated September 17, 2009 notes that the rating of 50 percent for migraines was continued. The VA lists as reasons supporting this decision the "summary of leave requests received March 13, 2008 show[ing] many requests for sick leave due to headaches; a review of VAMC [Veterans' Administration Medical Center] records from April 24, 2008 through June 24, 2009 showing that Mr. Adams "report[ed] headache frequency of once or twice per week on average; and the records showing that "most of [Mr. Adams's] headaches are prostrating and last up to 24 hours, causing [him] to miss many days of work."

(modifications in original).

An evaluation of 50 percent is assigned from July 2, 2004. An evaluation of 50 percent is granted if the record shows very frequent completely prostrating, and prolonged attacks productive of severe economic inadaptability.

Since there is a likelihood of improvement, the assigned evaluation is not considered permanent and is subject to a future review examination.

Finally, another VA rating decision contained in the record, dated February 2, 2010, stated: "We received a Notice of Disagreement from you on November 15, 2007 about one or more of our earlier decisions. Based on a review of the evidence listed below, we have made the following decisions on your claim." The February 2, 2010 VA decision did not discuss plaintiff's migraine headaches. In its February 2, 2010 rating decision, the VA increased plaintiff's "post traumatic stress disorder with depressed mood (formerly rated as adjustment disorder)," to fifty percent from thirty percent, and granted "[s]ervice connection for right knee patellofemoral syndrome" with "an evaluation of 10 percent effective December 15, 2006."

As is discussed further below, on January 28, 2008, Congress passed the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, 122 Stat 3 (Jan. 28, 2008). Title XVI of the Act, the "Wounded Warrior Act," established the Physical Disability Board of Review (PDBR). The PDBR was tasked with reviewing the disability ratings of service members who were separated from the armed forces between September 11, 2001 and December 31, 2009, if their separation was due to a medical condition, they received a disability rating of twenty percent or less, and were not otherwise eligible for retirement. See Wounded Warrior Act § 1643. On November 20, 2009, according to the parties' joint stipulation, "Mr. Adams petitioned the Physical Disability Board of Review ('PDBR'), seeking review of the 'original decision of the Army dated [May 3, 2004] and post TDRL rating dated [October 24, 2005].'" (modifications in original). In his application to the PDBR, Mr. Adams stated that he was "inappropriately rated at 20% by the US Army PEB." He asked for a review of the 2004 and 2005 informal PEB decisions, as contrasted with the higher VA ratings he had subsequently received.[11]

---

[11] There is a dispute as to whether plaintiff's application to the PDBR (Defense Department Form 294 (Jan. 2009 Rev.)), was filed by Mr. Adams pro se or by an attorney on plaintiff's behalf. Plaintiff's application stated that Mr. Adams was represented by Jason J. Quintero, from the firm of "Carlton Fields Attorneys at Law." Thomas A. Moore, a staff attorney at the National Veterans Legal Services Program, who is plaintiff's attorney of record in the above captioned case, in a sworn affidavit filed with the court, states that plaintiff was not represented by any counsel at the time he prepared his November 20, 2009 PDBR application. According to Mr. Moore, plaintiff included Mr. Quintero's name on the PDBR application "in the hope that he would be able to later obtain Mr. Quintero's agreement to extend his pro bono representation of Mr. Adams before the VA to pro bono representation of Mr. Adams before the PDBR,"

As stipulated to by the parties, on July 7, 2011, a three-person PDBR panel convened to review plaintiff's claims. The evidence the panel considered included plaintiff's "DD [Defense Department] Form 294," which was his application for review by the Physical Disability Board of Review, as well as his "Service Treatment Record," and "Department of Veterans' Affairs Treatment Record." The parties stipulated that: "The PDBR based its recommendations 'on the severity [of his conditions] evidenced at the time of his permanent separation,'" on November 21, 2005.[12] (modification in original).

A two-person majority of the three-person 2011 PDBR concluded that plaintiff's disability rating for his "Post-Concussive Migraine Headaches" condition should be raised from twenty percent to thirty percent. In determining which evidence was most probative as to plaintiff's injuries, the 2011 PDBR majority determined that "[t]he most influential evidence therefore is that obtained from the TDRL evaluation underpinning the PEB determinations at the time of permanent separation." The 2011 PDBR majority

---

despite the fact that Mr. Adams "had never discussed with Mr. Quintero the issue of representation before the PDBR." Additionally, Mr. Moore asserts that plaintiff was denied the ability to be represented by counsel after his application was submitted to the PDBR. Mr. Moore gives the following explanation: After plaintiff retained the National Veterans Legal Services Program, plaintiff's counsel wanted to supplement plaintiff's PDBR application. Providing as support a January 2011 e-mail chain attached to Mr. Moore's affidavit, Mr. Moore attests that the Chief of the Joint Central Adjudication of the PDBR, Greg Johnson, stated to a National Veterans Legal Services Program attorney: "'since you have indicated that [Mr. Adams] wishes to submit additional documentation, I will ensure that his case is not adjudicated until the documentation is received and reviewed.'" (modification in original). Nonetheless, according to Mr. Moore, the PDBR went ahead and adjudicated plaintiff's case in July of 2011. Mr. Moore stated in his affidavit:

> Despite Mr. Johnson's representation to Mr. Sonenshine [another National Veterans Legal Services Program attorney], these decisions were rendered before any additional documentation or supplementation was submitted on behalf of Mr. Adams, as the Administrative Record reflects. Thus, the only submission to the PDBR by Mr. Adams was his DD 294 application form, which was prepared pro se by Mr. Adams.

[12] The top of the first page of the 2011 PDBR record stated Mr. Adams' "SEPARATION DATE" as "20040701," or July 1, 2004, the date plaintiff was discharged from active duty after his 2004 informal PEB review. The record, as well as the parties' filings, however, indicate that plaintiff was separated from the Army due to his disabilities on November 21, 2005, shortly after his October 24, 2005 informal PEB review. The text of the 2011 PDBR majority decision also indicated that plaintiff was "medically separated" in 2005, after the 2005 informal PEB determination, and that before then his status was instead "temporary retirement."

decision acknowledged plaintiff's "contention that his combined VA rating of 80% [effective July 2, 2004] differs considerably from the 20% combined rating conferred by the U.S Army Physical Disability Agency (USAPDA)," the agency under which plaintiff's 2004 and 2005 informal PEBs operated. The parties stipulated: "The PDBR also noted that the VA had rated Mr. Adams's migraines under the disability rating criteria in VASRD Diagnostic Code 8100 (Migraines), ever since the VA issued 'its decision based on service records at the time of TDRL placement.'"

The 2011 PDBR majority decision found that since the VA findings were not within twelve months of plaintiff's separation from the Army, they were to be accorded no special benefit:

> The VA's initial rating evaluation was based on severity evidenced at the time of temporary retirement, which was 16 months prior to permanent separation; and, the first subsequent VA evaluation was performed 24 months after permanent separation. DoDI 6040.44 [Department of Defense Instruction 6040.44], under which the Board operates, specifies a 12-month interval for special consideration to VA findings. This does not mean that the VA clinical evidence at the time of temporary retirement and VA evaluations after permanent separation were disregarded; but, in matters germane to the severity of the CI's [claimant's] conditions and disability at the time of his permanent separation, the information in the service record proximal to that date (20051024) was assigned proportionately more probative value as a basis for the Board's rating recommendations.

The 2011 PDBR majority included a comparison table in their decision:

TDRL Rating Chart

| Final Service IPEB – Dated 20051024 | | | | VA* – All Effective 20040702 | | | |
|---|---|---|---|---|---|---|---|
| Condition On TDRL – 20040505 | Code | Rating TDRL | Rating Sep. | Condition | Code | Rating | Exam |
| Left C5-6 Radiculopathy | 8599-8513 | 20% | ** | Left C5-C6 Radiculopathy | 8513 | 20% | STR† |
| Cervical Disc Herniation | 5243 | 10% | 10% | Neck Injury, C4-C6 DDD | 5243 | 10% | STR |
| Post Concussive Migraines | 8045-9304* | 0% | 10% | Migraines | 8100 | 50% | STR |
| Left Plantar Fasciitis | | Not Unfitting | | L Heel Spurs, Fasciitis | 5299-5276 | 0% | STR |
| Asthma | | Not Unfitting | | Asthma | 6602 | 10% | STR |
| Sensory Neural Hearing Loss w/Tinnitus | | Not Unfitting | | Tinnitus | 6260 | 10% | STR |
| | | | | Bilateral hearing loss | 6100 | 0% | STR |
| ↓No Additional MEB/PEB Entries↓ | | | | Adjustment Disorder | 9440 | 30% | STR |
| | | | | Vertigo/Head Concussion | 8045-6204 | 10% | STR |
| | | | | Not Service Connected x 1 | | | |
| Combined: 20% | | | | Combined: 80% | | | |

\* Coded 8910 by the PEB at placement on TDRL.    † STR = Service Treatment Record
\*\* Condition deemed to be clinically resolved and did not appear on DA Form 199 at permanent separation.

(as in original).

The 2011 PDBR majority decision stated: "IAW [in accordance with] DoDI 6040.44 [June 2, 2009 Rev.], provisions of DoD or Military Department regulations or guidelines relied upon by the PEB will not be considered by the Board to the extent they were inconsistent with the VASRD in effect at the time of the adjudication." The 2011 PDBR majority decision briefly summarized the background of plaintiff's injury, stating in relevant part:

> The CI developed debilitating headaches after the 2003 MVA [motor vehicle accident]. . . . Posttraumatic headache is the most common symptom following mild head injury, although posttraumatic migraine headaches are less common. The evidence of record indicated that the CI had no migraine headaches prior to the MVA. If present, the clinical features of posttraumatic migraine headaches are similar to those of typical migraine. . . . Outpatient Neurology notes and the narrative summary (NARSUM) at the onset of TDRL documented both 'post-concussive' and 'migraine' descriptors for the headaches. The NARSUM stated, "He continues to have weekly migraines requiring him to leave his duty station, take medication and rest in a darkened room."

The PDBR majority decision commented, referring to Mr. Adams' October 24, 2005 informal PEB determination: "The PEB at the time of permanent separation characterized the condition as 'post-concussive migraine headaches' coded 8045-9304 ('brain disease due to trauma' analogous to 'dementia due to head trauma')." In reaching a determination on which diagnostic code to use to rate plaintiff's migraine condition, the 2011 PDBR majority decision stated:

> Regarding the appropriate coding option, although 8045 ["Brain disease due to trauma"] code is technically more accurate for the diagnosis, Board members concluded that the 8100 ["Migraine"] rating criteria are more applicable and fair for rating purposes. It was debated therefore whether a divergence from the more clinically specific 8045 code was justified by VASRD §4.7 (higher of two evaluations) and §4.3 (reasonable doubt). Consensus was that the DoDI 60.40.44 mandate for arriving at a "fair and equitable" recommendation justified resolution of this question in favor of the CI [claimant].

The 2011 PDBR majority decision coded "analogously to 8100 [Migraine]," however, rating plaintiff under DC 8199-8100, "MISCELLANEOUS DISEASES" analogous to "Migraine."[13] See 38 C.F.R. § 4.124a (2005) (capitalization in original). Using DC 8199-

_____

[13] The 2011 PDBR majority decision did not provide an explanation for why the PDBR majority rated plaintiff under DC 8199-8100, as opposed to DC 8100, "Migraine." It appears, however, that rating plaintiff under DC 8100, "Migraine," as opposed to DC 8199-8100, would not have resulted in a substantially different rating outcome. According to the VASRD in effect in 2005: "When an unlisted disease, injury, or residual

8100, "MISCELLANEOUS DISEASES" analogous to "Migraine," the PDBR majority decision assigned plaintiff a disability rating of thirty percent for his "Post-Concussive Migraine Headaches" "**UNFITTING CONDITION**." (capitalization and emphasis in original). The 2011 PDBR majority decision stated: "It was agreed that the episodes documented above were equivocally characterized as prostrating since it was not specified whether the headaches forced cessation of work activities, although reasonable doubt allows the assumption that at least some of them were." This resulted in a final recommendation by the 2011 PDBR majority of a forty percent disability rating for plaintiff, since the PDBR majority decision also continued plaintiff's ten percent disability rating for his "Cervical Disc Herniation" condition, pursuant to DC 5243, "Intervertebral disc syndrome." See 38 C.F.R. § 4.71a (2005).

The single minority member of the 2011 PDBR filed a dissenting decision, which consisted of two grounds for rejecting the majority recommendation. First, the minority decision contended that DC 8045, "Brain disease due to trauma," was "technically accurate for the diagnosis." The minority decision explained that, "Board members debated whether a divergence from the more clinically specific code [DC 8045, 'Brain disease due to trauma'] was justified by VASRD §4.7 (higher of two evaluations) and §4.3 (reasonable doubt)." The minority decision concluded:

> The evidence is clear that the CI [claimant] did not have migraine headaches prior to the MVA [motor vehicle accident] and that the headaches started as a result of the head trauma resulting from it. It readily follows that the coding and the rating of the headache condition by the PEB at the end of the TDRL period was supported, and that the PEB's interpretation of the VASRD guidelines for post-concussive headaches in effect at the time was correct. Unfortunately, the 8045 rating criteria in 2005 did not apply what we know about traumatic brain injuries today and did not take into consideration the nature of the headaches or the severity of the subjective symptoms that resulted from the head trauma. DoDI

---

condition is encountered, requiring rating by analogy, the diagnostic code number will be 'built-up' as follows: The first 2 digits will be selected from that part of the schedule most closely identifying the part, or system, of the body involved; the last 2 digits will be "99" for all unlisted conditions." 38 C.F.R. § 4.27 (2005). Under the 2005 VASRD, diagnostic code 8199 refers to "MISCELLANEOUS DISEASES," which is the category of diseases listed under the 81XX series of diagnostic codes. See 38 C.F.R. § 4.124a (2005) (capitalization in original). A rating of DC 8199-8100 appears to represent to a rating of "MISCELLANEOUS DISEASES," analogous to "Migraine." See id. (capitalization in original); see also Price v. Shinseki, No. 08-3390, 2010 WL 4987330, at *6 (Vet. App. Dec. 3, 2010) (referring to "'8199-8100'" as "an *analogous* condition under the DC for migraines" (internal citation omitted; emphasis in original)). Regardless, as discussed further below, the actual disability rating chosen still would be based on the diagnostic code following the hyphen, or DC 8100 in this case. See 38 C.F.R. § 4.27 (2005).

6040.44, however, is unequivocal in its stipulation that the VASRD criteria applied to Board recommendations are derived from the VASRD in effect at separation.

The 2011 PDBR minority decision also rejected the majority recommendation because, even if Mr. Adams were to be rated under DC 8100, "Migraine," plaintiff's condition would not warrant a thirty percent disability rating. The 2011 PDBR minority decision stated:

> I furthermore believe that, even if the 8100 rating criteria were conceded, it would be overly speculative to characterize the episodes documented at separation as *prostrating*. It was documented that the CI [claimant] was fully employed as a security guard by the VA at the time of permanent separation, and the record is devoid of evidence that the headaches forced cessation of work activities during the rating period (8100 specifies "last several months"). Board precedence, and the more typical VA practice, has been to define 'prostrating' by documented occurrences of the need to abandon work in order to treat the headache.

(emphasis in original). The 2011 PDBR minority decision, therefore, recommended that plaintiff's condition of "Post-Concussive Migraine Headaches" continue to be rated at ten percent under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma." The PDBR minority decision, as with the PDBR majority decision, also chose to continue plaintiff's ten percent disability rating for his "Cervical Disc Herniation" condition, rated under DC 5243, "Intervertebral disc syndrome." See 38 C.F.R. § 4.71a (2005).

On July 26, 2011, the Deputy Director of the PDBR, after reviewing the PDBR application, "Record of Proceedings," and majority and minority decisions, recommended that the Director for Army Review Boards, acting on behalf of the Secretary of the Army, accept Mr. Adams' 2011 PDBR majority recommendation. Nonetheless, on August 23, 2011, the Deputy Assistant Secretary for Army Review Boards, acting for the Secretary of the Army, chose to reject the PDBR majority recommendation. The Deputy Assistant Secretary's brief rationale, in support of selecting the PDBR minority decision, stated in full:

> I have reviewed the Board's record of proceedings, majority recommendation, and minority opinion (copy enclosed). I regret to inform you that I reject the Board's majority recommendation and accept the Board's minority opinion as accurate that your final Physical Evaluation Board disability rating remains unchanged. There is insufficient justification to support the Board's recommendation in accordance with Army and Department of Defense regulations.

The Deputy Assistant Secretary of the Army informed plaintiff that his recourse with the Department of Defense was exhausted, but that he could "seek relief by filing suit in a court of appropriate jurisdiction."

Plaintiff subsequently filed a complaint in the United States Court of Federal Claims, and alleges he "has been denied the disability retirement pay and benefits to which he is entitled under 10 U.S.C. § 1201 as a result of the Army's erroneous application of the VASRD." Plaintiff, in his complaint, seeks to vacate two separate determinations by the Secretary of the Army. Plaintiff seeks:

> (1) to vacate the 2005 "decision of the Army to assign Plaintiff a disability rating of less than 30% for his unfitting disability of migraine headaches and a combined disability rating of less than 40% for all of Plaintiff's physical injuries," because the decision is "unsupported by substantial evidence, arbitrary and capricious, and contrary to law;"

> (2) to vacate the 2011 "decision by the Secretary of the Army to reject the PDBR majority recommendation," because the decision is "unsupported by substantial evidence, arbitrary and capricious, and contrary to law."

Both of plaintiff's claims relate to the Secretary of the Army's interpretation of two VASRD diagnostic codes, DC 8100, "Migraine," and DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma." Plaintiff makes multiple arguments why the choice to rate plaintiff's "Post-Concussive Migraine Headaches" under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma," instead of DC 8100, "Migraine," was impermissible. Plaintiff argues that the Secretary of the Army's interpretation of the VASRD diagnostic codes is contrary to both their plain meaning and the controlling interpretation given to them by the United States Court of Appeals for Veterans Claims and the Board of Veterans Appeals. Plaintiff also argues that the Secretary ignored VA regulations that required the Secretary to resolve reasonable doubt in choosing between disability ratings in favor of plaintiff. Furthermore, plaintiff argues that the Secretary ignored DoDI 6040.44, which requires the PDBR to compare the VA's and Army's assigned disability ratings when making its rating decision. In addition, plaintiff argues that the Secretary ignored DoDI 1332.39 and Army Regulation 635-40, both of which plaintiff alleges prohibit the analogous rating of DC 8045, "Brain disease due to trauma," with DC 9304, "Dementia due to head trauma." Plaintiff also alleges that the minority member's determination that plaintiff's attacks were not "*prostrating*" was arbitrary, capricious, unsupported by substantial evidence, and contrary to law. (emphasis in original).

Plaintiff seeks (1) "money benefits that are formulaic in nature in an amount to be determined at trial;" (2) an "Order that Plaintiff's military records be corrected to reflect that he was assigned a 30% disability rating for his unfitting migraine headaches on November 21, 2005, the date Plaintiff was removed from the TDRL and separated from the Army;" (3) interest, costs, and attorneys' fees; and (4) such other relief as the Court

deems just and proper. The parties filed and briefed cross-motions for judgment on the administrative record.

## DISCUSSION

Plaintiff's case must be reviewed in the context of the Army's disability evaluation system in place at the times relevant to the events in plaintiff's case, including May 3, 2004, the date of plaintiff's MEB review, May 5, 2004 and October 24, 2005, the dates of plaintiff's two informal PEB reviews, his separation from the Army on November 21, 2005, and August 23, 2011, the date when plaintiff's PDBR application was denied by the Secretary of the Army. During the years at issue, Chapter 61 of Title 10 of the U.S. Code established the standards and processes by which the Army determined whether a service member should be retired or separated from service due to a medical disability. See 10 U.S.C. §§ 1201 et seq. Under the Army's disability evaluation system in effect May 3, 2004, the date of plaintiff's MEB review, service members whose condition fell below the Army's medical retention standards were first referred to a MEB, pursuant to Army Regulation 40-501, Ch. 7-4 (Apr. 12, 2004 Rev). Army Regulation 40-501, Chapter 3-30(g) listed "Migraine, tension, or cluster headaches, when manifested by frequent incapacitating attacks" as one of the conditions that triggered a referral to a MEB. Under Army regulations, the MEB collected and generated a complete record of the service member's medical condition. See Army Reg. 40-501, Ch. 3-4; see also DoDI 1332.28, Enclosure 3, Attachment 2 (Nov. 14, 1996 Rev.) (discussing the requirements for the MEB evaluation and narrative summary). Under the regulations in effect May 3, 2004, the results of the MEB evaluation of plaintiff were then sent to a PEB, which made "the determination of fitness or unfitness" to serve in the Army. Army Reg. 40-501, Ch. 3-4; see also Army Reg. 40-501, Ch. 3-3 ("Soldiers with conditions listed in [Army Regulation 40-501, Chapter 3] who do not meet the required medical standards will be evaluated by an MEB as defined in AR [Army Regulation] 40-400 and will be referred to a PEB as defined in AR [Army Regulation] 635-40 . . . ," listing certain exceptions not applicable to plaintiff's case).

An informal PEB reviewed plaintiff's condition on May 5, 2004, before placing plaintiff on the TDRL, and again on October 24, 2005, before final separation. At the time of both the 2004 and 2005 informal PEB reviews, the informal PEB was structured in accordance with Army Regulation 635-40 (Aug. 15, 1990 Rev.),[14] titled **Physical Evaluation for Retention, Retirement, or Separation**." (emphasis in original).[15] An

---

[14] Army Regulation 635-40 was updated on March 8, 2006, and again on March 20, 2012. The court, however, references the 1990 revision, which was in effect at the time of plaintiff's 2004 and 2005 informal PEB determinations. See Personnel Separations, Physical Evaluation for Retention, Retirement, or Separation, U.S. Army, http://www.apd.army.mil/jw2/xmldemo/r635_40/cover.asp (last visited August 20, 2014).

[15] DoDI 1332.39, "Application of the Veterans Administration Schedule for Rating Disabilities," (Nov. 14, 1996 Rev.) covered similar topics as Army Regulation 635-40,

informal PEB was designed to be a "fact-finding board," responsible for, among other duties, "[i]nvestigating the nature, cause, degree of severity, and probable permanency of the disability of soldiers whose cases are referred to the board," "[p]roviding a full and fair hearing for the soldier," and "[m]aking findings and recommendations required by law to establish the eligibility of a soldier to be separated or retired because of physical disability." Army Reg. 635-40, Ch. 4-17(a).

At the time of plaintiff's informal PEB reviews in 2004 and 2005, service members had to appear first before an informal PEB to be reviewed, before choosing whether to undergo a formal PEB. See Army Reg. 635-40, Ch. 4-20(a). An informal PEB, like a formal PEB consisted of "at least three members (president, personnel management officer, and a medical member). PEB members will be experienced officers who are thoroughly familiar with board procedures." Army Reg. 635-40, Ch. 4-17(b). According to the regulations in place at the time of plaintiff's 2004 and 2005 informal PEB reviews:

> The president and personnel management officers [of the PEB] will be field grade officers (other than Medical Corps) on active duty in the U.S. Army (other than active duty for training). The medical member will be either an officer of the U.S. Army Medical Corps or a Department of the Army civilian (DAC) physician with previous U.S. Army Medical Corps experience. The medical member must not have served in any capacity with the [MEB] that referred the soldier to the PEB.

Id. Despite their status as "informal," informal PEBs, nonetheless, were detailed, evaluative processes. According to the Army Regulation:

> Informal procedures reduce the overall time required to process a case through the disability evaluation system. An informal board must ensure that each case considered is complete and correct. The rapid processing intended by the use of informal boards must not override the fundamental requirement for detailed and uniform evaluation of each case. All evidence in the case file must be closely examined and additional evidence obtained if required.

---

including guidance as to how military review boards were to use and interpret the VASRD. See DoDI 1332.39 § 1; Army Reg. 635-40, App. B-1. Since it is the Secretary of the Army's decision at issue in plaintiff's case, the court refers to the more comprehensive Army Regulation. Defendant, in addition, noted that "we do not perceive any inconsistency between the relevant Army regulations and the relevant Department of Defense Instructions on any issue material to the outcome of this case." Plaintiff agreed, stating: "Plaintiff has reviewed the relevant DoDI [1332.39] and corresponding Army regulations [635-40] and determined that . . . the relevant provisions are largely similar and do not require this Court to ignore relevant Army regulations in favor of contrary DoDI."

Army Reg. 635-40, Ch. 4-20(a). After receiving the findings of the informal PEB, service members had to request a formal PEB hearing in order to be afforded one. See Army Reg. 635-40, Ch. 4-21(a) ("A soldier is entitled to a formal hearing if requested after informal consideration by a PEB."). The service member, however, could waive the right to appeal before a formal PEB by "concurring in the findings and recommendations of the informal board." Id.

Both informal and formal PEBs reached their determinations pursuant to Army Regulation 635-40, Chapter 4-19(a)–(q). The PEBs had the authority to determine by majority vote:

(1)      Whether the soldier is physically fit or unfit to perform the duties of the soldier's office, grade, rank, or rating.
(2)      Whether the disability is of a permanent nature.
(3)      Whether the disability meets the criteria established by law for compensation.

Army Reg. 635-40, Ch. 4-19(a). In addition to determining fitness to serve, the PEB determined the "severity" of the disability, and from that, "the eligibility of a soldier to be separated or retired because of physical disability." Army Reg. 635-40, Ch. 4-17(a); see also Army Reg. 635-40, App. C-7(a) ("If the soldier is found unfit, the PEB will . . . (2) Assign a percentage rating to the disability if the soldier otherwise qualifies."). In 2005, the year plaintiff separated from the Army, a service member given a disability rating of thirty percent or more, and who otherwise met the other requirements of 10 U.S.C. § 1201, was eligible for medical "retirement." Retirement from the Army in 2005 allowed the service member to receive ongoing retirement payments, among other benefits. See 10 U.S.C. §§ 1201, 1401.[16] In contrast, a service member who was given a disability rating of "less than 30 percent" was only eligible for medical "separation." See 10 U.S.C. § 1203. A service member medically "separated" from the Army received a lump sum severance payment at separation. See 10 U.S.C. § 1212.

Alternatively, at the time of plaintiff's 2004 and 2005 informal PEB reviews, if the informal or formal PEB determined that a service member's "disability is not determined to be of a permanent nature and stable" at the time of the PEB, the PEB could place that service member on the Temporary Disability Retired List, or TDRL. See 10 U.S.C. § 1202; Army Reg. 635-40, Chs. 3-9(b), 4-19(h). A service member placed on the TDRL

---

[16] "Those with disabilities rated at 30 percent or higher are medically retired, entitling them and their families to health care for life through the military's TRICARE health care program, a military pension, and access to commissary and post exchange benefits." Hearing to Receive Testimony on the Department of Defense and Veterans Affairs Disability Rating Systems and the Transition of Servicemembers from the Department of Defense to the Department of Veterans Affairs, 110th Cong. 2 (Apr. 12, 2007) (Opening Statement of Senator Carl Levin, Chairman, Committee on Armed Services).

would be reevaluated in eighteen months, see 10 U.S.C. § 1210(a); Army Reg. 635-40, Ch. 4-19(h), but treated as medically "retired" for the interim period. See 10 U.S.C. § 1202. Plaintiff was placed on the TDRL after his 2004 informal PEB, and was medically separated from the Army after his 2005 informal PEB.

At the time of plaintiff's 2004 and 2005 informal PEB reviews, the Army determined disability ratings based on the "standard schedule of rating disabilities in use by the Department of Veterans Affairs at the time of the determination." See 10 U.S.C. § 1201(b)(3)(B). The VA Schedule of Rating Disabilities, or VASRD, is articulated in 38 C.F.R. Part 4. See generally 38 C.F.R. Pt. 4 (2005). Army regulations further required that, "[i]f the soldier is entitled to disability benefits, the PEB decides the rating for each compensable disability from the VASRD, as modified by appendix B." Army Reg. 635-40, Ch. 4-19(f)(5). The VASRD contains a comprehensive listing of four-digit diagnostic codes and an associated menu of disability ratings. See, e.g., DC 8100, "Migraine," 38 C.F.R. § 4.124a (2005). At the time of plaintiff's 2004 and 2005 informal PEB reviews, a PEB, whether formal or informal, would first choose the proper four-digit diagnostic code to apply to the service member's condition. Then, based on the diagnostic code accompanying the rating scheme, the PEB would select a particular disability rating to best reflect the severity of the service member's condition. See, e.g., 38 C.F.R. § 4.124a (2005); see also Army Reg. 635-40, Ch. 4-19(i) ("Percentage ratings reflect the severity of the soldier's medical condition at time of rating."); Army Reg. 635-40, App. B-14.

The VASRD at 38 C.F.R. § 4.124a (2005), at the time of plaintiff's 2004 and 2005 informal PEB reviews, contained two of the diagnostic codes at issue in the above captioned case, DC 8100, "Migraine," and DC 8045, "Brain disease due to trauma." These two diagnostic codes were promulgated into the regulations in 1964, and remained unchanged in any relevant manner by the time of defendant's November 21, 2005 separation from the Army. See 29 Fed. Reg. 6718, 6750–51 (May 22, 1964); 41 Fed. Reg. 1129, 11301–02 (Mar. 18, 1976). The VASRD at 38 C.F.R. § 4.130 (2005) contained the other diagnostic code at issue, DC 9304, "Dementia due to head trauma." This diagnostic code was promulgated in 1988 and also was not significantly changed by the time of plaintiff's 2005 separation from the Army. See 53 Fed. Reg. 21, 23 (Jan. 4, 1988). Under DC 8100, "Migraine," the following disability rating options were available at the time of plaintiff's 2004 and 2005 informal PEB reviews:

8100 Migraine:

With very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability ................ 50% [rating]
With characteristic prostrating attacks occurring on an average once a month over last several months ...................................... 30% [rating]
With characteristic prostrating attacks averaging one in 2 months over last several months ............................................................ 10% [rating]
With less frequent attacks ......................................................... 0% [rating]

38 C.F.R. § 4.124a (2005). DC 8045, "Brain disease due to trauma," did not directly assign ratings, but was used in conjunction with another diagnostic code to result in a combined rating for a particular disease or injury. The following language, in its entirety, was found in DC 8045 at the time of plaintiff's 2004 and 2005 PEB reviews:

> 8045 Brain disease due to trauma:
>
> Purely neurological disabilities, such as hemiplegia, epileptiform seizures, facial nerve paralysis, etc., following trauma to the brain, will be rated under the diagnostic codes specifically dealing with such disabilities, with citation of a hyphenated diagnostic code (e.g., 8045-8207).
>
> Purely subjective complaints such as headache, dizziness, insomnia, etc., recognized as symptomatic of brain trauma, will be rated 10 percent and no more under diagnostic code 9304. This 10 percent rating will not be combined with any other rating for a disability due to brain trauma. Ratings in excess of 10 percent for brain disease due to trauma under diagnostic code 9304 are not assignable in the absence of a diagnosis of multi-infarct dementia associated with brain trauma.

38 C.F.R. § 4.124a (2005). DC 9304, referred to within the text of DC 8045, was defined in the VASRD as "Dementia[17] due to brain trauma." See 38 C.F.R. § 4.130 (2005). In the 2005 regulation, all mental disorders (VASRD DCs 9201 to 9521), except eating disorders (DCs 9520, 9521) were assigned disability ratings under a common rating scale. See id. (the "General Rating Formula for Mental Disorders"). A disability rating of ten percent could be awarded under DC 9304, "Dementia due to head trauma," a mental disorder, for "[o]ccupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by continuous medication." Id.

Under the VASRD, at the time of plaintiff's 2004 and 2005 informal PEB reviews, a service member was only allowed to be rated under one VASRD diagnostic code for a single disability or condition. See, e.g., 38 C.F.R. § 4.124a (2005) (stating that a ten percent rating under DC 8045-9304, "Brain disease due to trauma," analogous to

---

[17] Unlike other sections of the VASRD, the diagnostic codes in 38 C.F.R. § 4.130, including DC 9304, "Dementia due to head trauma," cited an outside source to explain their meanings. See 38 C.F.R. § 4.130 (2005) ("The nomenclature employed in this portion of the rating schedule [VASRD DCs 9201 to 9521] is based upon the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, of the American Psychiatric Association (DSM–IV)," published in 1994.).

"Dementia due to head trauma," "will not be combined with any other rating for a disability due to brain trauma"); see Cullen v. Shinseki, 24 Vet. App. 74, 83–84 (2010) (stating that "a claimant is not entitled to more than one disability rating for a *single disability*," and explaining that while a single disability can be made up of multiple symptoms, ratings based on individual symptoms instead of the whole disability picture can result in duplicative and inappropriately cumulative disability ratings (emphasis in original)). Subpart A of the VASRD, 38 C.F.R. §§ 4.1–4.31 (2005), also contained guidance on how a review board should interpret the VASRD. The 2011 PDBR majority decision in plaintiff's case referenced 38 C.F.R. § 4.3, titled "**Resolution of reasonable doubt**," and 38 C.F.R. § 4.7, titled "**Higher of two evaluations**," in its analysis. (emphasis in original). The PDBR majority decision discussed "whether a divergence from the more clinically specific 8045 code was justified by VASRD §4.7 (higher of two evaluations) and §4.3 (reasonable doubt)." The regulation at 38 C.F.R § 4.3 stated:

> It is the defined and consistently applied policy of the Department of Veterans Affairs to administer the law under a broad interpretation, consistent, however, with the facts shown in every case. When after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding the degree of disability such doubt will be resolved in favor of the claimant. See [38 C.F.R.] § 3.102 of this chapter.

38 C.F.R. § 4.3 (2005).[18]

---

[18] The language of 38. C.F.R. § 4.3 (2005) is similar to other statutory and regulatory language not part of the VASRD, but which also directs the VA to give the benefit of the doubt in rating decisions to the veteran. See 38 U.S.C. § 5107 (2012) ("**(b) Benefit of the doubt.—** The Secretary shall consider all information and lay and medical evidence of record in a case before the Secretary with respect to benefits under laws administered by the Secretary. When there is an approximate balance of positive and negative evidence regarding any issue material to the determination of a matter, the Secretary shall give the benefit of the doubt to the claimant." (emphasis in original)); 38 C.F.R. § 3.102 (2014) ("When, after careful consideration of all procurable and assembled data, a reasonable doubt arises regarding service origin, the degree of disability, or any other point, such doubt will be resolved in favor of the claimant. By reasonable doubt is meant one which exists because of an approximate balance of positive and negative evidence which does not satisfactorily prove or disprove the claim. It is a substantial doubt and one within the range of probability as distinguished from pure speculation or remote possibility. It is not a means of reconciling actual conflict or a contradiction in the evidence."). Moreover, the United States Court of Appeals for the Federal Circuit has stated that "by statute and regulation," the veteran is given the "benefit of the doubt" "regarding any issue material" to the veteran's claim "'when there is an approximate balance of positive and negative evidence.'" See Fagan v. Shinseki, 573 F.3d 1282, 1287 (Fed. Cir. 2009) (quoting 38 U.S.C. § 5107(b)); see also Gilbert v. Derwinski, 1 Vet. App. 49, 53–55 (1990) ("Therefore, a veteran need only demonstrate

Moreover, 38 C.F.R. § 4.7, titled "**Higher of two evaluations**," (emphasis in original) required all disability review boards to consider:

> Where there is a question as to which of two evaluations shall be applied, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria required for that rating. Otherwise, the lower rating will be assigned.

38 C.F.R. § 4.7 (2005). In other words, 38 C.F.R § 4.7, "**Higher of two evaluations**," asked the reviewer to make a fact-driven decision, looking at the service members individual "disability picture." Id. (emphasis in original). The reviewer was supposed to choose the higher rating option "if the disability picture more nearly approximates the criteria required for that rating." Id. Application of 38 C.F.R. §§ 4.3 and 4.7 had to be specific to the facts in the record before the reviewing body.

At the time of Mr. Adams' 2004 and 2005 PEB reviews, and up until January 28, 2008, the date of enactment of the Wounded Warrior Act, the Army instructed PEBs to utilize the actual VASRD schedules of diagnostic codes, but not the guidance on how to use the schedule provided by the VA in Subpart A of the VASRD. According to the Army Regulation: "The first 31 paragraphs of the VASRD [38 C.F.R. § 4 Subpart A], which provide general policies, do not apply [to PEB reviews] and have been replaced by section I and II of appendix B of this regulation [Army Regulation 635-40]." Army Reg. 635-40, Ch. 4-19(i). The Army created its own supplement to the VASRD, in the form of Appendix B of Army Regulation 635-40, "Army Application of the Department of Veterans Affairs Schedule for Rating Disabilities." The Army appendix included guidance on how to choose between multiple disability ratings. See Army Reg. 635-40, App. B-4, B-8. The appendix also included guidance on how to rate disabilities not covered by the VASRD, see Army Reg. 635-40, App. B-9, as well as guidance on how to combine ratings for multiple separate disabilities.[19] Section III of Army Regulation

---

that there is an 'approximate balance of positive and negative evidence' in order to prevail." (citation omitted)).

[19] Pursuant to the Army Regulation, "[w]hen a soldier has more than one compensable disability, the percentages are combined rather than added (except when a 'Note' in the VASRD indicates otherwise)." Army Reg. 635-40, App. B-12. "Thus, a person having a 60 percent disability is considered to have a remaining efficiency of 40 percent. if [sic] he has a second disability rated at 20 percent, then he is considered to have lost 20 percent of that remaining 40 percent, thus reducing his remaining efficiency to 32 percent." Id. In essence, this utilizes an inverse multiplication calculation, in which the final disability rating = $1 - \%Healthy_{final}$, where $\%Healthy_{final} = (1 - \%Disability_1)*(1 - \%Disability_2) \ldots (1-\%Disability_n)$. The Army approach was similar to the VA approach. See 38 C.F.R. § 4.25 (2005).

635-40, Appendix B also contained the Army's explanations of various VASRD codes. See generally Army Reg. 635-40, App. B.

Furthermore, at the time of plaintiff's 2004 and 2005 informal PEB reviews, Army Regulation 635-40, Appendix B included guidance on how to rate medical conditions not diagnosable using a single VASRD diagnostic code. Injuries and diseases were to be considered first in assigning diagnostic codes. See Army Reg. 635-40, App. B-14; see also 38 C.F.R. § 4.27 (2005) (containing similar guidance). At that time, as well as today, many diagnostic codes in the VASRD characterizing diseases or injuries did not have complementary disability ratings,[20] or, the ratings provided at times may have inadequately described the severity of the service member's actual medical condition. In those cases, the Army Regulation instructed: "If the rating is determined on the basis of residual conditions, the code appropriate to the residual condition will be added, preceded by a hyphen." Army Reg. 635-40, App. B-14. Army Regulation 635-40, Appendix B stated that hyphenated codes "are used in the following circumstances:"

    a.    When the VASRD provides that a listed condition is to be rated as some other code, for example, myocardial infraction rated as arteriosclerotic heart disease (7006-7005) or nephrolithiasis rated as hydronephrosis (7508-7509).

    b.    When the VASRD provides a minimum rating and the unfitting disability is being rated on residuals, for example, multiple sclerosis rated with very diffuse residuals, rated by analogy (8018-8105).

    c.    When an unlisted condition is rated by analogy, for example, spondylolisthesis rated as lumbrosacral strain (5299-5295). When an unlisted disease, injury, or residual condition is encountered, requiring rating by analogy, the diagnostic code number will be "built-up" as follows. The first two digits will be selected from the part of the schedule most closely identifying the part, or system, of the body involved. The last two digits will be "99" for all unlisted conditions. This procedure will facilitate a close check of new and unlisted conditions rated by analogy.

Id. The Army Regulation Appendix B and VASRD also provided similar, but not identical, guidance on when hyphenated, analogous ratings were not to be used. According to Army Regulation 635-40, Appendix B:

---

[20] For example, relevant to the above captioned case, DC 8045 "Brain disease due to trauma," diagnoses the disease, but has no complementary disability rating, and, therefore, has to be paired with another diagnostic code that accurately describes the residual medical conditions the service member experience as a result of the disease. See 38 C.F.R. § 124a (2005).

**B–8. Analogous ratings**

When an unlisted condition is encountered, it is rated under a closely related disease or injury in which not only the functional, but the anatomical localization and symptomatology are closely analogous. Conjectural analogies, as well as the use of analogous ratings for conditions of doubtful diagnosis, or those not fully supported by clinical and laboratory findings, are to be avoided. The ratings for organic diseases and injuries are not to be assigned by analogy to conditions of psychological origin (VASRD Codes 9000-9511).[21]

Army Reg. 635-40, App. B-8. (emphasis in original). The 2005 informal PEB decision, and 2011 PDBR minority decision, rated plaintiff's migraines under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma." See 38 C.F.R. §§ 124a, 4.130 (2005). The 2011 PDBR majority referred to DC 8045-9304 as "'brain disease due to trauma' analogous to 'dementia due to head trauma.'" The 2011 PDBR majority rated plaintiff under DC 8199-8100, "MISCELLANEOUS DISEASES" analogous to "Migraine." See 38 C.F.R. § 4.124a (2005) (capitalization in original).

---

[21] Plaintiff claims that the last sentence of Army Regulation 635-40, Appendix B-8, "implies that the Army regulations recognize a sharp distinction between organic diseases and psychological conditions. DC 8045-9304, ['Brain disease due to trauma,' analogous to 'Dementia due to head trauma'] according to this logic, seems to be a contradictory coding." DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma," was the rating assigned by plaintiff's 2005 informal PEB and 2011 PDBR minority decision to Mr. Adams' migraine headache condition. All the diseases listed under DC 8000 to 8099 in the 2005 VASRD, including DC 8045, "Brain disease due to trauma," were under the title "ORGANIC DISEASES OF THE CENTRAL NERVOUS SYSTEM." See 38 C.F.R. § 4.124a (2005) (capitalization in original). The Army Regulation indicated that VASRD diagnostic codes 9000–9511, including DC 9304, "Dementia due to head trauma," are "conditions of psychological origin." See Army Reg. 635-40, App. B-8. At the time of plaintiff's 2004 and 2005 informal PEB reviews, the note under DC 8045 stated, however: "Purely subjective complaints such as headache, dizziness, insomnia, etc., recognized as symptomatic of brain trauma, will be rated 10 percent and no more under diagnostic code 9304," and appears to have allowed a joint rating of DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma." Furthermore, the instruction under Army Regulation 635-40, Appendix B-8 did not limit the language contained in the actual VASRD schedules. See Army Reg. 635-40, Ch. 4-19(i). The court also notes that the VASRD contained different guidance: "Nor will ratings assigned to organic diseases and injuries be assigned by analogy to conditions of functional origin." 38 C.F.R. § 4.20 (2005)." The VA's regulation would not appear to have rendered a rating of DC 8045-9304 improper, as DC 9304, "Dementia due to head trauma," could be read as a disease of psychological or cognitive origin, not functional origin. See 38 C.F.R. §§ 4.20, 4.130 (2005); Army Reg. 635-40, App. B-8.

On January 28, 2008, Congress passed the National Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, 122 Stat 3. Title 16 of the National Defense Authorization Act for Fiscal Year 2008, encompassing sections 1601 to 1676, as noted above, is known as the "Wounded Warrior Act." See Nat'l Def. Authorization Act for Fiscal Year 2008, tit. XVI, § 1601. The Wounded Warrior Act, in section 1642 (codified at 10 U.S.C. § 1216a), limited the ability of the Department of Defense to diverge from the rating system and approach established in the VASRD. According to the Wounded Warrior Act section 1642:

**SEC. 1642. REQUIREMENTS AND LIMITATIONS ON DEPARTMENT OF DEFENSE DETERMINATIONS OF DISABILITY WITH RESPECT TO MEMBERS OF THE ARMED FORCES.**

(a) IN GENERAL.—Chapter 61 of title 10, United States Code, is amended by inserting after section 1216 the following new section:

**"§ 1216a. Determinations of disability: requirements and limitations on determinations**

''(a) UTILIZATION OF VA SCHEDULE FOR RATING DISABILITIES IN DETERMINATIONS OF DISABILITY.—(1) In making a determination of disability of a member of the armed forces for purposes of this chapter, the Secretary concerned—

''(A) shall, to the extent feasible, utilize the schedule for rating disabilities in use by the Department of Veterans Affairs,[22] including any applicable interpretation of the schedule by the United States Court of Appeals for Veterans Claims; and

''(B) except as provided in paragraph (2), may not deviate from the schedule or any such interpretation of the schedule.

''(2) In making a determination described in paragraph (1), the Secretary concerned may utilize in lieu of the schedule described in that paragraph such criteria as the Secretary of Defense and the Secretary of Veterans Affairs may jointly prescribe for purposes of this subsection if the utilization of such criteria will result in a determination of a greater percentage of disability than would be otherwise determined through the utilization of the schedule.

''(b) CONSIDERATION OF ALL MEDICAL CONDITIONS.—In making a determination of the rating of disability of a member of the armed

---

[22] The court notes that all of 38 C.F.R. Part 4 (2005) falls under the title "**SCHEDULE FOR RATING DISABILITIES**." (capitalization and emphasis in original). This includes not just the list of diagnostic codes, but also the thirty one sections under Subpart A, "**General Policy in Rating**." (emphasis in original). These sections provide guidance as to how the VASRD is to be used. As mentioned above, the Army previously did not utilize 38 C.F.R. Part 4, Subpart A, and instructed its reviewers to use Army Regulation 635-40, Appendix B. See Army Reg. 635-40, App. B-2.

forces for purposes of this chapter, the Secretary concerned shall take into account all medical conditions, whether individually or collectively, that render the member unfit to perform the duties of the member's office, grade, rank, or rating.''.

(b) CLERICAL AMENDMENT.—The table of sections at the beginning of chapter 61 of such title is amended by inserting after the item relating to section 1216 the following new item:

"1216a. Determinations of disability: requirements and limitations on determinations.''.

Wounded Warrior Act § 1642 (all capitalization, emphasis, and quotations in original).

The Wounded Warrior Act, in the next section, section 1643 (codified at 10 U.S.C. § 1554a), established the PDBR. The PDBR is tasked with reviewing the disability ratings of service members who were separated from the armed forces between September 11, 2001 and December 31, 2009, if their separation was due to a medical condition, they received a disability rating of twenty percent or less, and were not otherwise eligible for retirement. See Wounded Warrior Act § 1643. Like the PEB, the PDBR is composed of three members. See id. Upon the request of a covered individual, meeting the requirements of Wounded Warrior Act § 1643, the PDBR is supposed to review the findings and decisions of the service member's prior PEB, "based on the records of the armed force concerned and such other evidence as may be presented[,]" including witnesses. See id. The PDBR is authorized to recommend to the secretary of the appropriate service branch:

(1) No recharacterization of the separation of such individual or modification of the disability rating previously assigned such individual.

(2) The recharacterization of the separation of such individual to retirement for disability.

(3) The modification of the disability rating previously assigned such individual by the Physical Evaluation Board concerned, which modified disability rating may not be a reduction of the disability rating previously assigned such individual by that Physical Evaluation Board.

(4) The issuance of a new disability rating for such individual.

Id. According to Wounded Warrior Act § 1643, the Secretary of the Army "may correct the military records of a covered individual in accordance with a recommendation made by the [Physical Disability Board of Review]." Id. Changes can relate back to the effective date of the action taken by a prior PEB. See id. The Wounded Warrior Act also states: "The Secretary of Defense shall establish the board of review required by section 1554a of title 10, United States Code (as added by subsection (a)), and prescribe the regulations required by such section . . . ." Wounded Warrior Act § 1643(b).

When implementing the National Defense Authorization Act for Fiscal Year 2008, and its title XVI, the Wounded Warrior Act, the military issued DoDI 6040.44, "Lead DoD Component for the Physical Disability Board of Review (PDBR)," on June 27, 2008, and then amended the instruction on June 2, 2009.[23] The instruction, DoDI 6040.44, emphasizes the DoD policy regarding the PDBR: "The purpose of the PDBR shall be to reassess the accuracy and fairness of the combined disability ratings assigned Service members who were discharged . . . with a combined disability rating of 20 percent or less and were not found to be eligible for retirement." See DoDI 6040.44 § 4(a). The instruction reiterated the broad scope of allowable evidence that could be considered by a PDBR, permitting not only all of the evidence considered by the PEB, but also ratings issued by the VA and any newly discovered evidence. See DoDI 6040.44, Enclosure 3 § 5(a). According to DoDI 6040.44, the PDBR also is to compare the applicant's VA ratings with the ratings given by the military at the time of separation:

> Once obtained, the PDBR should compare any DVA disability rating for the specifically military unfitting condition(s) with the PEB combined disability rating and consider any variance in its deliberations and any impact on the final PEB combined disability rating, particularly if the DVA rating was awarded within 12 months of the Service member's separation.

DoDI 6040.44, Enclosure 3 § 5(a)(4).[24] According to DoDI 6040.44, the PDBR is instructed to "establish a recommendation based on a vote of a simple majority of the

---

[23] The court references the amended instruction.

[24]  Plaintiff maintains that "nowhere in the analysis of the PDBR minority member or the Deputy Assistant Secretary is there an indication that they 'compare[d]' the VA rating with the PEB rating or that they 'consider[ed]' the variance, as the DODI requires." (modifications in original). Defendant responds that "the record is clear that the PDBR was well-aware of the VA's actions," and appropriately considered plaintiff's VA ratings in their determination. The 2011 PDBR majority decision indicates that there was discussion by the members of the 2011 PDBR at the outset of its review about how to consider the VA record, and the 2011 PDBR majority decision included a comparison table. The 2011 PDBR majority decided to give weight to other of plaintiff's medical examinations that were closer in time to plaintiff's November 21, 2005 separation, noting that as the VA rating evaluations were more than twelve months apart from the date of plaintiff's permanent separation, thus, pursuant to DoDI 6040.44, they were not to be accorded special consideration. The 2011 PDBR majority decision concluded:

> This does not mean that the VA clinical evidence at the time of temporary retirement and VA evaluations after permanent separation were disregarded; but, in matters germane to the severity of the CI's conditions and disability at the time of his permanent separation, the information in the service record proximal to that date (20051024) was assigned proportionately more probative value.

board members." DoDI 6040.44, Enclosure 3 § 5(f). The Secretary of the Army must "accept or reject recommendations of the PDBR," although there was no mention in DoDI 6040.44 whether or not the Secretary of the Army must explain his or her decision. See DoDI 6040.44, Enclosure 3 § 5(h)(3).

DoDI 6040.44 also discusses how the PDBR should use the VASRD, given Congress' new instructions in section 1642 of the Wounded Warrior Act. According to the instruction, the PDBR is to conduct reviews "in accordance with the VASRD in effect at the time of separation." DoDI 6040.44, Enclosure 3 § 5(e). DoDI 6040.44, Enclosure 3 § 4(d) also instructs the PDBR to "[u]se the VASRD in arriving at its recommendations, along with all applicable statutes, and any directives in effect at the time of the contested separation (to the extent they do not conflict with the VASRD in effect at the time of the contested separation)." Additionally, the instruction at Enclosure 3 § 5(e)(1) states:

> If the case was adjudicated by the final Military Department PEB and the covered individual was separated from military service prior to January 28, 2008, the PDBR shall also review the disability rating(s) of the covered individual, in accordance with the VASRD in effect at the time of separation for the covered individual. Provisions of DoD or Military Department regulations or guidelines relied upon by the PEB will not be considered by the PDBR to the extent they were inconsistent with the VASRD in effect at the time of the adjudication. If the covered individual was separated from military service on or after January 28, 2008, the PDBR shall use the VASRD without application of Reference (m),[25] along with any applicable interpretation of the VASRD by the United States Court of Appeals for Veterans Claims.

DoDI 6040.44, Enclosure 3 § 5(e)(1).

---

Recently, a Judge of this court issued Hatmaker v. United States, No. 13-719C, 2014 WL 3767049, at *8 (Fed. Cl. July 31, 2014), and found that the PDBR gave sufficient consideration of the plaintiff's VA ratings because the PDBR "compared the PEB and DVA disability ratings in a side-by-side table," "described the various medical examination reports created during the DVA-arranged visits between January and February 2008," and discussed inconsistencies. See id.

[25] Reference (m) refers to "DoD Instruction 1332.39, 'Application of the Veterans Administration Schedule for Rating Disabilities, November 14, 1996.'" DoDI 6040.44, Enclosure 1. As mentioned above, DoDI 1332.39 covers the use of the VASRD by military review boards, and contains similar content to that in Army Regulation 635-40.

The PDBR may review an updated, broader record than was available to a PEB, including "all the information necessary for competent review and recommendation," and can consider VA determinations made after plaintiff's separation from the military and witness testimony. See DoDI 6040.44, Enclosure 3 § 5(a), (d); see also Wounded Warrior Act § 1643 (The PDBR review shall be "based on the records of the armed force concerned and such other evidence as may be presented to the Physical Disability Board of Review. A witness may present evidence to the Board by affidavit or by any other means considered acceptable by the Secretary of Defense."). In Pearl v. United States, a Judge of the United States Court of Federal Claims noted that the PDBR made its decision based on an even larger administrative record than was available to the PEB — such as the records from the MEB, PEB, VA, and the U.S. Army Physical Disability Agency. See Pearl v. United States, 111 Fed. Cl. 301, 307 (2013) ("The Board of Review uses the complete case record as well as any new evidence the parties present to review the soldier's disability rating.").

Applicants to a PDBR review not only can make the same arguments brought forward to a service member's prior PEB, but may make additional arguments as well. According to DoDI 6040.44, upon request, the PDBR can review conditions "identified but not determined to be unfitting"[26] by a service member's prior PEB. See DoDI 6040.44 § 4(a), Enclosure 3 § 5(e)(2)(b). The PDBR also is not limited to the arguments made by the service member in his or her PDBR application. For example, the form plaintiff filled out in his application to the PDBR stated under "Burden of Proof:" "Member need not allege anything, review accomplished upon request." See DD Form 294, OMB No. 0704-0453 (Jan. 2009); see also Silbaugh v. United States, 107 Fed. Cl. 143, 150 (2012). Furthermore, the Wounded Warrior Act enables the Secretary of Defense not only to modify a service member's previously granted disability rating, but also to "issu[e] a new disability rating" upon a recommendation by the PDBR. See Wounded Warrior Act § 1643.

In Silbaugh v. United States, a Judge of the United States Court of Federal Claims determined that PDBRs conduct "de novo" reviews. See Silbaugh v. United States, 107 Fed. Cl. at 150. The court stated:

The PDBR reviewed plaintiff's case de novo. See DODI 6040.44 ¶ 4.b. (instructing the PDBR to "impartially readjudicate cases upon which review is requested or undertaken on its own motion"). DODI 6040.44 requires the PDBR to issue recommendations based on the complete case record that was before the PEB and, to the extent feasible, "all the information necessary for competent review and recommendation." Id., Encl. 3., ¶ 5.d. Accordingly, the PDBR reviewed both plaintiff's military and DVA [Department of Veterans Affairs] medical records to determine the

---

[26] An "unfitting" condition is a condition that makes a service member unfit to continue to serve in the armed forces. See Army Reg. 40-501, Ch. 3-4.

"accuracy and fairness" of plaintiff's disability rating. see DODI 6040.44 ¶ 4.a.

Id. (internal citation removed). Similarly, in Hatmaker v. United States, another Judge of the United States Court of Federal Claims held that the PDBR conducts "de novo" reviews, noting that under DoDI 6040.44 § 4(b), "'[t]he PDBR shall . . . impartially readjudicate cases upon which review is requested or undertaken on its own motion.'" Hatmaker v. United States, 2014 WL 3767049, at *8. Moreover, PDBR review panels in at least four separate decisions have stated that they had the authority to conduct, or conducted, de novo evaluations of the record. See, e.g., PDBR Case No. PD0900676, at 3 (Feb. 16, 2011) ("[T]he Board considered the appropriate deduction for non-compliance de novo."); PDBR Case No. PD0900054, at 12 (Jan. 05, 2010) ("[T]he Board considered the shoulder conditions de novo for an unfitness determination."); PDBR Case No. PD0900260, at 6 (Nov. 17, 2009) ("Using a de novo evaluation of the evidence, the Board determined that LBP [low back pain] should be changed to an unfitting condition . . . ."); PDBR Case No. PD0900275, at 3 (Aug. 25, 2009) ("De-novo rating of the VA exam would also rate at 30%."). The court also notes that, by statute, a PDBR decision, if in plaintiff's favor, can be made retroactive to the applicant's initial date of medical separation. See Wounded Warrior Act § 1643 ("Any such correction may be made effective as of the effective date of the action taken on the report of the Physical Evaluation Board to which such recommendation relates.").

According to the Department of Defense in its instruction, DoDI 6040.44, "Lead DoD Component for the Physical Disability Board of Review (PDBR)," a PDBR "shall impartially readjudicate cases upon which review is requested or undertaken on its own motion." DoDI 6040.44, Enclosure 3 § 4(b). The instruction further states that "[t]he purpose of the PDBR shall be to reassess the accuracy and fairness of the combined disability ratings assigned Service members who were discharged as unfit . . . with a combined disability rating of 20 percent or less and were not found to be eligible for retirement." DoDI 6040.44 § 4(a). A review of the record indicates that Mr. Adams' 2011 PDBR conducted a de novo review of the 2005 informal PEB decision using the complete record in front of the 2005 informal PEB as well as additional evidence.

The parties' numerous briefs focus on the merits of Mr. Adams' 2011 PDBR decision, with far less attention paid to Mr. Adams' 2005 informal PEB rating. Plaintiff argues that DC 8100, "Migraine," is a better choice for his disability, and that he should have been rated under DC 8100, "Migraine" as opposed to DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma," referring primarily to the record pertaining to Mr. Adams' 2011 PDBR review.[27] The court notes

_____

[27] Defendant argues that plaintiff knowingly and intelligently waived his right to review the Army's 2005 informal PEB decision, because plaintiff made no attempt to seek review of the 2005 informal PEB decision. The record does not indicate that plaintiff consented to the informal PEB decision by signing a DA Form 199 and marking that he concurred with the 2005 informal PEB decision, as he had done with the 2004 informal

defendant's comment in its motion for judgment on the administrative record: "Because the minority PDBR decision did not change the rating awarded by the 2005 PEB, Mr. Adams's brief does not appear to raise stand-alone challenges to the 2005 PEB decision." Defendant also comments that "[i]n any event, any distinction between the 2005 and 2011 proceedings is one without a difference in this case. Mr. Adams has essentially treated the two decisions, which reached the same result, as one and the same." Therefore, considering that plaintiff's 2011 PDBR review addressed the entire record before his 2005 informal PEB and more, and considering that plaintiff has declined to make any arguments specific to Mr. Adams' 2005 PEB review, the court proceeds to focus its review on Mr. Adams' 2011 PDBR determination.

Defendant also argued, initially, that plaintiff had waived certain arguments which Mr. Adams did not raise in front of the 2011 PDBR, but now has raised before this court. Defendant stated in its motion for judgment on the administrative record:

> Mr. Adams failed to assert many of the arguments he is making before this Court to the PDBR. Mr. Adams relies almost entirely upon his argument that the Army erred in its selection of Diagnostic Code 8045, rather than 8100. Mr. Adams claims, for the first time, that "the plain language of the VASRD indicates that [the] VA intentionally and purposely excluded migraines from the scope of [Diagnostic Code 8045, among others] . . . and intended migraines be evaluated instead under . . . [Diagnostic Code] 8100." Similarly, Mr. Adams only now claims that, "even if there were any ambiguity in the VASRD . . . the Supreme Court has counseled strongly that 'interpretative doubt is to resolved in the veteran's favor" [sic] and that, "[i]n rejecting use of DC 8100, neither the PDBR minority nor the Secretary cited or discussed these reasonable doubt rules, apparently preferring instead to cast a veil of silence over the difficulties these rules present." Finally, for the first time before this Court, Mr. Adams makes his argument that the Army was required to follow Board of Veterans' Appeals case law that allegedly required the Army to rely upon Diagnostic Code 8100 rather than Diagnostic Code 8045-9304.
>
> Despite being represented by counsel, Mr. Adams did not raise those arguments before the PDBR, and, thus, the PDBR did not have an opportunity to consider them.

---

PEB decision, nor does the record indicate that he submitted an appeal "within the prescribed time limits" after he received notice of the 2005 informal PEB decision. See Army Reg. 635-40, Ch. 4-21(a). The record further indicates that since receipt of the October 17, 2005 notice of the decision, and the later Army memorandum, dated November 17, 2005, informing Mr. Adams that his case had moved on "for further processing," plaintiff did not challenge the PEB decision until he applied to the PDBR in 2009. The 2011 PDBR majority decision also stated that "[t]he Cl [claimant] made no appeals" after his 2005 informal PEB review.

(modifications in original; internal citations omitted). Defendant initially asserted in its motion for judgment on the administrative record that plaintiff's failure to make all his legal arguments within the earlier, PDBR application, "prevented the [Army] from itself having an opportunity to entertain any claim or objection and to develop a full record that this court now could review." (quotation omitted; modification in original). Defendant later withdrew this argument, however, citing the decision issued by a Judge of this court in Silbaugh v. United States, 107 Fed. Cl. 143. In Silbaugh, the United States Court of Federal Claims confronted a similar issue, and concluded:

> [T]he PDBR is not equivalent to a board for correction of military records. In fact, the instruction sheet accompanying the application for PDBR review explicitly states that, unlike a servicemember seeking review by a correction board, a servicemember seeking PDBR review "need not allege anything, [sic] review accomplished upon request." Because plaintiff was not required to raise her VASRD § 4.129 argument before the PDBR, plaintiff's failure to raise the issue could not have resulted in a waiver of her VASRD § 4.129 claim.

Silbaugh v. United States, 107 Fed. Cl. at 150–51 (internal citations omitted); see also Pearl v. United States, 111 Fed. Cl. at 310 (In a case involving the Physical Disability Board of Review, the court dismissed defendant's waiver argument, stating, "this rule does not apply when the administrative body whose decision is being challenged addressed an issue *sua sponte*. The mere fact that the issue before the administrative body was not raised by the parties does not put the issue beyond this court's review.").

In general, the court reviews the decision of the Secretary of the Army in plaintiff's case "to determine whether it is arbitrary, capricious, unsupported by substantial evidence, or contrary to law." Lewis v. United States, 458 F.3d 1372, 1376 (Fed. Cir.) (citing Martinez v. United States, 333 F.3d 1295, 1305, 1314 (Fed. Cir. 2003), cert. denied, 540 U.S. 1177 (2004)), reh'g en banc denied (Fed. Cir. 2006), cert. denied, 552 U.S. 810 (2007); see also Chappell v. Wallace, 462 U.S. 296, 303 (1983) ("Board decisions are subject to judicial review and can be set aside if they are arbitrary, capricious, or not based on substantial evidence."); Burnick v. United States, 541 F.3d 1372, 1377 (Fed. Cir. 2010); Barnes v. United States, 473 F.3d 1356, 1361 (Fed. Cir. 2007) ("We apply the same standard of review as the United States Court of Federal Claims, which means 'we will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005)); Metz v. United States, 466 F.3d 991, 998 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006); Porter v. United States, 163 F.3d 1304, 1312 (Fed. Cir. 1998), reh'g denied, en banc suggestion declined (Fed. Cir.), cert. denied, 528 U.S. 809 (1999); Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983); Skinner v. United States, 219 Ct. Cl. 322, 331, 594 F.2d 824, 830 (1979); Spellissy v. United States, 103 Fed. Cl. 274, 283 (2012) ("[W]hen a service member chooses to seek relief from a military corrections board, the

court 'will not disturb the decision of [a] corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.'" (quoting Chambers v. United States, 417 F.3d at 1227) (second modification in original)). In Riser v. United States, the United States Court of Federal Claims noted that plaintiff must show that the decision by the Army Board for Correction of Military Records was arbitrary and capricious, contrary to law, or unsupported by substantial evidence, and that, in accordance with this deferential standard of review, the court does not reweigh the evidence, "but rather considers whether *the conclusion being reviewed* is supported by substantial evidence. So long as the Board considered the relevant evidence and came to a reasonable conclusion, this court will not disturb the Board's decision." Riser v. United States, 97 Fed. Cl. 679, 683–84 (2011) (quoting Heisig v. United States, 719 F.2d at 1157) (emphasis in original; other citations omitted); see also Holmes v. United States, 98 Fed. Cl. 767, 780–81 (2011) ("'The Board's decision will comply with the substantial evidence standard so long as a 'reasonable mind might accept' [the] particular evidentiary record as "adequate to support [the contested] conclusion."'" (quoting Dickinson v. Zurko, 527 U.S. 150, 162 (1999) (quoting Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938))) (modifications in original)).

This standard of review is narrow. The court does not sit as "a super correction board." Skinner v. United States, 219 Ct. Cl. at 331, 594 F.2d at 830; see also Voge v. United States, 844 F.2d 776, 782 (Fed. Cir. 1988) (The "court does not function as 'a sort of super Correction Board.'" (quoting Reale v. United States, 208 Ct. Cl. 1010, 1013, 529 F.2d 533 (1976))). Moreover, "military administrators are presumed to act lawfully and in good faith like other public officers, and the military is entitled to substantial deference in the governance of its affairs." Dodson v. United States, 988 F.2d 1199, 1204 (Fed. Cir.), reh'g denied (Fed. Cir. 1993). "'[J]udges are not given the task of running the Army.'" Antonellis v. United States, 723 F.3d 1328, 1332 (Fed. Cir. 2013) (quoting Orloff v. Willoughby, 345 U.S. 83, 93 (1953)). The United States Supreme Court, however, has also stated:

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given. SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) [reh'g denied and reh'g denied sub nom. SEC v. Fed. Water & Gas Corp. (1947)]. We will, however, "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc., 419 U.S. [281,] 286, 95 S. Ct. 438, 42 L. Ed. 2d 447 [(1974)]. See also Camp v. Pitts, 411 U.S. 138, 142–143, 93 S. Ct. 1241, 36 L. Ed. 2d 106 (1973) (per curiam).

<u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43–44 (1983) (other citations omitted); <u>see</u> <u>also</u> <u>SKF USA Inc. v. United States</u>, 630 F.3d 1365, 1373 n.3 (Fed. Cir. 2011)). In sum, as a Judge of the United States Court of Federal Claims explained in <u>Verbeck v. United States</u>:

> The court's review in these matters is thus limited in scope and deferential in nature. Ms. Verbeck must show that the Board's decision was arbitrary and capricious, contrary to law, or unsupported by substantial evidence. <u>See</u> <u>Chambers v. United States</u>, 417 F.3d 1218, 1227 (Fed. Cir. 2005) [<u>cert.</u> <u>denied</u>, 546 U.S. 1066 (2005)]; <u>Godwin v. United States</u>, 338 F.3d 1374, 1378 (Fed. Cir. 2003); <u>Heisig [v. United States]</u>, 719 F.2d [1153, 1156 (Fed. Cir. 1983)]. . . . The Board's decision will comply with the substantial evidence standard so long as a "'reasonable mind might accept' [the] particular evidentiary record as 'adequate to support [the contested] conclusion.'" <u>Dickinson v. Zurko</u>, 527 U.S. 150, 162, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999) (quoting <u>Consolidated Edison Co. of N.Y. v. NLRB</u>, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)). Similarly, the arbitrary and capricious standard "requires a reviewing court to sustain an action evincing rational reasoning and consideration of relevant factors." <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d 1054, 1058 (Fed. Cir.[), <u>reh'g</u> <u>denied</u> (Fed. Cir. 2000)].
>
> In sum, the court must satisfy itself that the Board considered all of the relevant evidence and provided a reasoned opinion that reflects a contemplation of the facts and circumstances pertinent to the case before it. <u>See</u> <u>Heisig</u>, 719 F.2d at 1157 ("Under the substantial evidence rule, *all* of the competent evidence must be considered, whether original or supplemental, and whether or not it supports the challenged conclusion."); <u>Van Cleave v. United States</u>, 70 Fed. Cl. 674, 678–79 (2006) (While the court does not "serve as a 'super correction board[,]' <u>Skinner v. United States</u>, [219 Ct. Cl. at 331] . . . correction boards must examine relevant data and articulate satisfactory explanations for their decisions.") (citations omitted). If the Board "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the [Board], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise[,]" its decision runs afoul of even this lenient standard of review. <u>Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.</u>, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983).

<u>Verbeck v. United States</u>, 97 Fed. Cl. 443, 451 (2011) (second omission in original); <u>see</u> <u>also</u> <u>PAI Corp. v. United States</u>, 614 F.3d 1347, 1351 (Fed. Cir. 2010) (citing <u>Advanced Data Concepts, Inc. v. United States</u>, 216 F.3d at 1058).

In Mr. Adams' case, the Deputy Assistant Secretary for Army Review Boards, acting for the Secretary of the Army, and despite the Deputy Director of the PDBR recommendation in favor of the 2011 PDBR majority decision, gave no reason for rejecting the 2011 PDBR majority recommendation, and endorsed the minority decision without comment. The Deputy Assistant Secretary stated, in full:

I have reviewed the Board's record of proceedings, majority recommendation, and minority opinion (copy enclosed). I regret to inform you that I reject the Board's majority recommendation and accept the Board's minority opinion as accurate that your final Physical Evaluation Board disability rating remains unchanged. There is insufficient justification to support the Board's recommendation in accordance with Army and Department of Defense regulations.

The 2011 PDBR majority decision in Mr. Adams' case found that, although DC 8045, "Brain disease due to trauma" was "technically accurate for the diagnosis" and more "clinically specific," DC 8100, "Migraine," was "more applicable and fair for rating purposes," and assigned Mr. Adams a thirty percent disability rating under DC 8199-8100, "MISCELLANEOUS DISEASES" analogous to "Migraine." (capitalization in original). See 38 C.F.R. § 4.124a (2005); see also Price v. Shinseki, 2010 WL 4987330, at *6 (referring to DC 8199-8100 as "an *analogous* condition under the DC for migraines" (emphasis in original)). The 2011 PDBR majority decision stated: "Consensus was that DoDI 6040.44 mandate for arriving at a 'fair and equitable' recommendation justified resolution of this question in favor of the CI [claimant]." The 2011 PDBR majority decision also stated: "It was agreed that the episodes documented above were equivocally characterized as prostrating since it was not specified whether the headaches forced cessation of work activities, although reasonable doubt allows the assumption that at least some of them were." This led to a final, combined recommendation for a forty percent disability rating for plaintiff, because plaintiff was also given a ten percent disability rating for "Cervical Disc Herniation."

The 2011 PDBR minority decision, which, as stated above, the Secretary of the Army adopted, objected to the decision by the PDBR majority members on two grounds. The minority decision first contended that the choice to rate plaintiff's "Post-Concussive Migraine Headaches" condition under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma," was "technically accurate," and preferable to a rating under DC 8100, "Migraine." The minority member's decision's entire, brief, explanation in this regard was:

The evidence is clear that the CI did not have migraine headaches prior to the MVA [motor vehicle accident] and that the headaches started as a result of the head trauma resulting from it. It readily follows that the coding and the rating of the headache condition by the PEB at the end of the TDRL period was supported, and that the PEB's interpretation of the VASRD guidelines for post-concussive headaches in effect at the time

was correct. Unfortunately, the 8045 ['Brain disease due to trauma'] rating criteria in 2005 did not apply what we know about traumatic brain injuries today and did not take into consideration the nature of the headaches or the severity of the subjective symptoms that resulted from the head trauma. DoDI 6040.44, however, is unequivocal in its stipulation that the VASRD criteria applied to Board recommendations are derived from the VASRD in effect at separation.

Plaintiff contends that the accurate selection of VASRD diagnostic codes is "critical" in this case, because plaintiff cannot succeed if rated under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma." According to plaintiff, "[t]his issue is critical because, as defendant repeatedly and correctly emphasizes, the maximum rating that plaintiff's migraines could receive using DC 8045 ['Brain disease due to trauma'] is 10%." (internal citation omitted). Defendant similarly notes that "[t]he central issue in this case is whether the Army reasonably chose to apply Diagnostic Code 8045 ['Brain disease due to trauma']." Defendant, however, challenges plaintiff's arguments as trying to disguise an issue of fact as an issue of law, stating: "Mr. Adams ignores the fact that the Army's rating decision required more than regulatory construction." Defendant further states:

> Even assuming for the sake of argument that the Army *could* have selected Diagnostic Code 8100 ["Migraine"], rather than Diagnostic Code 8045 ["Brain disease due to trauma"], Mr. Adams's challenge is, in essence, an inappropriate attempt to second-guess the Army's reasonable judgment call to evaluate his condition based upon the latter code.

(citing Grieg v. United States, 226 Ct. Cl. 258, 269, 640 F.2d 1261, 1268 (1981), cert. denied, 455 U.S. 907 (1982)) (emphasis in original). In support, defendant also cites to the case of Butts v. Brown, 5 Vet. App. 532 (1993) (en banc), which states in part:

> The selection of the proper DC [diagnostic code] is not a question of law because it is a determination that is completely dependent upon the facts of a particular case. It involves the application of the law—in this case a regulation—to a specific set of facts—in this case a particular condition affecting a claimant . . . .
>
> We now hold that the Court may set aside the BVA's [Board of Veterans Appeals'] selection of a DC [Diagnostic Code] in a particular case only if such selection is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

Id. at 538–39 (citations omitted). Plaintiff responds that whether the minority decision gave the terms "migraine" and "headache" their correct meanings under the VASRD is a question of law that can be evaluated without deference to the 2011 PDBR minority member or the Secretary of the Army. Plaintiff states:

The interpretation of a statute or, as here, a regulation, is a question of law. *See*, *e.g.*, *Jensen v. Brown*, 19 F.3d 1413, 1415 (Fed. Cir. 1994). The Court's scope of review of this question of law is *de novo*. See, e.g., Lane v. Principi, 339 F.3d 1331, 1339 (Fed. Cir. 2003).

Generally, as discussed above, the Secretary of the Army's application of a military disability rating to a service member's condition is entitled to deference and is a fact-specific examination, judged as to whether it is "arbitrary, capricious, unsupported by substantial evidence, or contrary to law." See Lewis v. United States, 458 F.3d at 1376; see also Skinner v. United States, 219 Ct. Cl. at 331; Spellissy v. United States, 103 Fed. Cl. at 283; Verbeck v. United States, 97 Fed. Cl. at 451 (citing Heisig v. United States, 719 F.2d at 1156). In plaintiff's case, the Secretary of the Army's rating determination relied on the 2011 PDBR minority decision's interpretation of the meaning and application of two diagnostic codes within the VASRD, DC 8100, "Migraine," and DC 8045, "Brain disease due to trauma." 38 C.F.R. § 4.124a (2005). The court reviews an agency's interpretation of a regulation as a question of law, and awards deference to the agency's interpretation only if it is a valid interpretation. See 5 U.S.C. § 706 ("[T]he reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."); Haas v. Peake, 525 F.3d 1168, 1186 (Fed. Cir. 2008) ("An agency's interpretation of its regulations is entitled to 'substantial deference,' requiring a court to defer to the agency's interpretation 'unless an alternative reading is compelled by the regulation's plain language or by other indications of the [agency's] intent at the time of the regulation's promulgation.'" (quoting Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994)), cert. denied, 555 U.S. 1149 (2009) (modification in original)); Towne v. United States, 106 Fed. Cl. 704, 712 (2012) ("The DoD's interpretation is only entitled to deference if it is within the range of acceptable meanings of 'combat-related operations,' as those words can be understood using ordinary rules of statutory construction." (citing Cuomo v. Clearing House, 557 U.S. 519, 525 (2009) (citing Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984)))); Miss. Dep't of Rehab. Servs. v. United States, 61 Fed. Cl. 20, 24 (2004) ("As the reviewing Court, we 'decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.'" (quoting 5 U.S.C. § 706 (2000)). The dispute in plaintiff's case turns on the meaning of the VASRD diagnostic codes, and whether the 2011 PDBR minority member's interpretation of the VASRD diagnostic codes at issue was permissible, given the language of the VASRD, and the case law from the United States Court of Appeals for Veterans Claims. In addition, plaintiff argues that the case law from the Board of Veterans Appeals also applies. A decision by the Secretary of the Army that relied on an improper reading of a statute, regulation, or relevant, binding case law would be arbitrary, capricious and contrary to law. See 5 U.S.C. § 706; Chambers v. United States, 417 F.3d at 1224; Towne v. United States, 106 Fed. Cl. at 712.

As noted above, the VASRD diagnostic codes at issue in the above captioned case are:

8045 Brain Disease Due to Trauma:

Purely neurological disabilities, such as hemiplegia, epileptiform seizures, facial nerve paralysis, etc., following trauma to the brain, will be rated under the diagnostic codes specifically dealing with such disabilities, with citation of a hyphenated diagnostic code (e.g., 8045-8207).

Purely subjective complaints such as headache, dizziness, insomnia, etc., recognized as symptomatic of brain trauma, will be rated 10 percent and no more under diagnostic code 9304. This 10 percent rating will not be combined with any other rating for a disability due to brain trauma. Ratings in excess of 10 percent for brain disease due to trauma under diagnostic code 9304 are not assignable in the absence of a diagnosis of multi-infarct dementia associated with brain trauma.

. . .

8100 Migraine:

With very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability ................ 50% [rating]
With characteristic prostrating attacks occurring on an average once a month over last several months ..................................... 30% [rating]
With characteristic prostrating attacks averaging one in 2 months over last several months .............................................................. 10% [rating]
With less frequent attacks ........................................................ 0% [rating]

38 C.F.R. § 4.124a (2005).

A third diagnostic code, also relevant to the dispute before the court, DC 9304, "Dementia due to head trauma," has no description accompanying the diagnostic code. See 38 C.F.R. § 4.130 (2005). Instead, at the time of plaintiff's 2004 and 2005 PEB reviews, all mental disorders (VASRD DCs 9201 to 9521), except eating disorders (DCs 9520, 9521), were assigned disability ratings under a common rating scale. See id. (the "General Rating Formula for Mental Disorders"). A rating of ten percent can be awarded under this code for "[o]ccupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by continuous medication." Id.

Plaintiff argues that the Secretary of the Army's choice in 2011 to rate plaintiff's migraine condition under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma," instead of DC 8100, "Migraine," was incorrect. Plaintiff first argues that the 2011 PDBR minority decision's interpretation of the VASRD diagnostic codes at issue, which the Secretary of the Army adopted, "violates the plain language of the VASRD," and also is contrary to the controlling interpretations of the VASRD issued by the United States Court of Appeals for Veterans Claims, as well as those issued by the Board of Veterans Appeals. Plaintiff contends that the minority decision conflated two key terms in the VASRD that should not have been interchanged: migraines and headaches. Plaintiff alleges that the minority decision incorrectly concluded that under the VASRD migraines could be rated the same as headaches for rating purposes. Plaintiff states that the evidence "demonstrates that the medical personnel evaluating and treating SSG Adams consistently diagnosed him with migraines," listing as examples Mr. Adams' evaluations by Dr. Brooks, First Lieutenant VanHemel, Dr. Byrnes, and Dr. Garcia. Plaintiff adds that the diagnoses of many medical doctors that plaintiff suffered from migraines is not challenged by the government: "The Government has not and cannot appeal the Government's own finding. Accordingly, the Court and the parties to this lawsuit are bound by the 2005 PEB's conclusion that Adams suffered from 'postconcussive migraine headaches' that rendered him unfit for continued service." (internal citation omitted). Plaintiff contends that the 2011 PDBR minority decision, adopted by the Secretary of the Army, improperly confused and failed to distinguish plaintiff's "Post-Concussive Migraine Headaches" condition, which was listed as the "**UNFITTING CONDITION**" in the PDBR minority decision, from the separate disability of "post-concussive headaches," which the PDBR minority member also used to describe plaintiff's disability within the text of the minority decision. (capitalization and emphasis in original). Plaintiff states: "[T]he proper interpretation of the VASRD is that *all* migraine headaches, whether post-concussive or not, be rated using the disability rating criteria in DC 8100, ['Migraine'] and that post-concussive headaches other than migraine headaches be rated using the disability rating criteria in DC 8045 ['Brain disease due to trauma']." (emphasis in original). Plaintiff argues that the plain meaning of the VASRD mandates that plaintiff's migraine condition be rated under DC 8100, "Migraine," as opposed DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma." Plaintiff also argues, in the alternative, that if the meanings of the diagnostic codes are ambiguous, under section 1642 of the Wounded Warrior Act, the interpretations of the VASRD by the Court of Appeals for Veterans Claims and Board of Veterans Appeals were binding on the Secretary of the Army and the 2011 PDBR. Plaintiff adds that both the Court of Appeals for Veterans Claims and Board of Veterans Appeals interpret the terms "migraine" and "headache" materially different from each other for rating purposes, and prohibit the rating of a migraine condition under a diagnostic code other than DC 8100, "Migraine."

Defendant states that "the plain language of the VASRD clearly supports the Army's decision that Diagnostic Code 8045-9304 ['Brain disease due to trauma,' analogous to 'Dementia due to head trauma,'] is accurate for Mr. Adams's diagnosis."

According to defendant, "[m]oreover, the Court of Appeals for Veterans Claims has affirmed the use of Diagnostic Code 8045 ['Brain disease due to trauma'] for headaches resulting from trauma." Defendant contends, in contrast to plaintiff's argument, that the interpretations of the VASRD by the Board of Veterans Appeals do not bind the Secretary of the Army, and states that "any requirement to follow the interpretations of the Court of Appeals for Veterans Claims (Veterans Court) simply does not constitute a requirement to follow interpretations of the BVA [Board of Veterans Appeals]." Additionally, defendant presents policy arguments advocating independence for the Secretary of the Army to choose between different disability rating options.

The court first addresses whether the plain language of the VASRD allows for, or precludes, the 2011 PDBR minority member's choice to rate plaintiff's migraines under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma." Plaintiff argues that the plain language of the VASRD indicates that DC 8100, "Migraine," refers to a unique and distinct disease condition from either DC 8045, "Brain disease due to trauma," or DC 9304, "Dementia due to head trauma." Plaintiff quotes Russello v. United States: "'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion.'"" (quoting Russello v. United States, 464 U.S. 16, 23 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972))). Plaintiff claims that the cannon described by the United States Supreme Court in Russello applies to interpretation of the VASRD as much as to interpretation of statutes, and quotes from Smith v. Brown, 35 F.3d 1516, 1523 (Fed. Cir. 1994), which states "canons of construction of course apply equally to any legal text and not merely to statutes." See also id. ("'Regulations, like statutes, are interpreted according to the canons of construction.'" (quoting Black & Decker Corp. v. Comm'r, 986 F.2d 60, 65 (4th Cir.1993))). Plaintiff notes that in the VASRD, the term "Migraine" is mentioned only once, in the title of DC 8100. See 38 CFR Pt. 4 (2005). Plaintiff further points out, however, that many diagnostic codes discuss the term "headache" in their rating scheme or notes, including DC 5025 ("Fibromyalgia"), DC 6314 ("Beriberi"), DC 8046 ("Cerebral arteriosclerosis"), and DC 8045 ("Brain disease due to trauma"). 38 C.F.R. §§ 4.71a, 4.88b, 4.124a (2005).[28] Plaintiff argues, therefore, that under the canon of construction in Russello v. United States, a migraine condition can only be rated under DC 8100, "Migraine."

In contrast, defendant argues that instead of "headache" or "Migraine," the key term to examine is "trauma," and like plaintiff applies the same canon of construction discussed by plaintiff with reference to Russello, stating: "The same argument could be made with respect to the presence of words 'brain disease due to trauma' in Diagnostic Code 8045 and the absence of a reference to trauma in Diagnostic Code 8100 . . . ."

---

[28] The court notes that there are other references to "headache" in the VASRD in effect in 2004 and 2005, such as DC 6514 ("Sinitus") and DC 7700 ("Anemia"), which discuss headaches in their rating schemes or notes. See 38 C.F.R. §§ 4.97, 4.117 (2005).

Defendant acknowledges that it is undisputed that plaintiff suffered an injury due to trauma during the car accident while he was deployed. Defendant points out that DC 8100, "Migraine," does not discuss trauma, but that DC 8045, "Brain disease due to trauma," and DC 9304, "Dementia due to head trauma," both mention the term "trauma." Defendant argues, therefore, that under <u>Russello</u>, plaintiff's condition should be rated only under a diagnostic code that includes the term "trauma." Plaintiff responds that the canon discussed in <u>Russello</u> does not apply to defendant's example, since the term "trauma" appears in many places within the VASRD, such as in DC 5010 ("Arthritis due to trauma") and DC 6520 ("Larynx, stenosis of, including residuals of laryngeal trauma"). 38 C.F.R. §§ 4.71a, 4.97 (2005). Plaintiff responds that focusing on the term that identifies the cause of the injury, in this case "trauma," is a mistake, and that, instead, the terms of greater importance for determining the meaning of the diagnostic code are the terms representing the disease or injury. According to plaintiff:

> [T]he diagnostic codes in the VASRD are used to categorize disabilities. *See* 38 C.F.R. § 4.1 ("This rating schedule is primarily a guide in the evaluation of disability resulting from all types of diseases and injuries encountered as a result of or incident to military service"). "Trauma" is not a disability. "Trauma" is an event; an event that may or may not cause a disability. "Migraines" and "Brain Disease" are disabilities.

Defendant responds that this distinction is without legal significance, and emphasizes that "Mr. Adams's headaches (Mr. Adams's 'brain disease') were *due* to trauma." (emphasis in original).

United States Supreme Court cases subsequent to <u>Russello</u> have applied the canon of statutory construction described in that case to infer congressional intent when one section of an Act is lacking specific language contained in a different section of the same Act. <u>See</u>, <u>e.g.</u>, <u>Barnhart v. Sigmon Coal Co.</u>, 534 U.S. 438, 452–53 (2012) ("Where Congress wanted to provide for successor liability in the Coal Act, it did so explicitly, as demonstrated by [26 U.S.C.] §§ 9706(b)(2) and 9711(g)(1). If Congress had meant to make a preenactment successor in interest like Jericol liable, it could have done so clearly and explicitly." (citing as example <u>Russello v. United States</u>, 464 U.S. at 23)); <u>United States v. Gonzales</u>, 520 U.S. 1, 5 (1997) ("Given that Congress expressly limited the phrase 'any crime' to only federal crimes, we find it significant that no similar restriction modifies the phrase 'any other term of imprisonment,' which appears only two sentences later and is at issue in this case." (quoting 18 U.S.C.A. § 924(c) (1991)); <u>Fedorenko v. United States</u>, 449 U.S. 490, 512 (1981) ("That Congress was perfectly capable of adopting a 'voluntariness' limitation where it felt that one was necessary is plain from comparing § 2(a) with § 2(b) [of the Displaced Persons Act of 1948, 62 Stat. 1009], which excludes only those individuals who '*voluntarily* assisted the enemy forces . . . in their operations . . . .' Under traditional principles of statutory construction, the deliberate omission of the word 'voluntary' from § 2(a) compels the conclusion that the statute made *all* those who assisted in the persecution of civilians ineligible for visas." (modifications and emphasis in original)). The United States Supreme Court, however,

also has indicated that the Russello cannon has to be considered in the overall light of congressional intent, and that reviewing courts should "'"look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."'" Negusie v. Holder, 555 U.S. 511, 519 (2009) (quoting Dada v. Mukasey, 554 U.S. 1, 16 (2008) (quoting Gozlon–Peretz v. United States, 498 U.S. 395, 407 (1991))). The United States Supreme Court has also cautioned against the use of the Russello canon where there are an increasing number of differences between the provisions being compared. See City of Columbus v. Ours Garage and Wrecker Serv., Inc., 536 U.S. 424, 425 (2002) ("The Russello presumption—that the presence of a phrase in one provision and its absence in another reveals Congress' design—grows weaker with each difference in the formulation of the provisions under inspection."). The Russello canon of statutory construction has been followed by the United States Court of Appeals for the Federal Circuit. See, e.g., Burden v. Shinseki, 727 F.3d 1161, 1171 (Fed. Cir.) (The Federal Circuit cited Russello v. United States and held that since 38 U.S.C. § 103(a) granted the VA authority determine, by "evidence satisfactory to the Secretary," what is a "marriage," the lack of that same language in a later provision, section 103(c), meant that the VA had to defer to state law and could not set its own evidentiary standards for what is a marriage.), reh'g and reh'g en banc denied (Fed. Cir. 2013), cert. denied, 134 S. Ct. 2134 (2014); Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d 1041, 1052 (Fed. Cir.) (The Federal Circuit cited Russello in noting "Congress's use of the term 'jurisdiction' in [28 U.S.C.] §§ 1581–1584 but not in § 1585 suggests that it did not intend" for "the concept of supplemental jurisdiction" to apply to 28 U.S.C. § 1585.), cert. denied, 133 S. Ct. 126 (2012).

Under the VASRD, terms representing the resulting disease or injury effect, in this case "Migraine" or "Brain disease," are more relevant for determining the application of a diagnostic code than the term that identifies the cause, in this case, "trauma." VA regulations specify that VASRD diagnostic codes are to be chosen based on how well they represent a disease or injury condition, not the cause of the injury, such as "trauma." See 38 C.F.R. § 4.1 (2005) ("The percentage ratings represent as far as can practicably be determined the average impairment in earning capacity resulting from such diseases and injuries and their residual conditions in civil occupations."); 38 C.F.R. § 4.27 (2005) ("With diseases, preference is to be given to the number assigned to the disease itself; if the rating is determined on the basis of residual conditions, the number appropriate to the residual condition will be added, preceded by a hyphen."). Even though, as defendant notes, the term "headache" appears multiple times in the VASRD, the Federal Circuit has applied the Russello canon of construction even when a term has been applied more than once in other areas of a body of law. See, e.g., Sioux Honey Ass'n v. Hartford Fire Ins. Co., 672 F.3d at 1052 ("Further, that 28 U.S.C. § 1585 does not contain a 'jurisdiction' term is telling, especially because the Customs Courts Act *does* refer to 'jurisdiction' numerous times in neighboring provisions (i.e., §§ 1581–1584)." (emphasis in original)).

The term "Migraine" only appears once in the VASRD, whereas the term "headache" appears multiple times in separate locations within the VASRD. See

generally 38 C.F.R Pt. 4 (2005). Given that the term "Migraine" is only found in DC 8100, and in no other part of the VASRD, the regulatory intent behind the VASRD would appear to be for those service members with a diagnosis of "Migraine" to be rated under DC 8100, "Migraine." That plaintiff was diagnosed with a migraine condition is not in dispute. Both the PDBR majority and minority decisions listed Mr. Adams' "**UNFITTING CONDITION**" as "Post-Concussive Migraine Headaches." (capitalization and emphasis in original). The vast majority of the medical professionals who examined plaintiff, including those relevant examinations of Mr. Adams closest in time to his October 24, 2005 informal PEB and November 21, 2005 separation from the Army, concluded that plaintiff was suffering from "migraines," or "migraine headaches."[29]

There are multiple, different terms, "Migraine," "Brain disease," and "headache," in the various diagnostics codes at issue. When there is different language in two sections of a regulatory scheme, as opposed to when there is language in one section of a regulatory scheme that does not exist in the other section, the Russello canon is less helpful to resolve the issue. See Russello v. United States, 464 U.S. at 23 (The United States Supreme Court stated that when there is different language between two sections of a legal text, "[w]e refrain from concluding here that the differing language in the two subsections has the same meaning in each."). Furthermore, none of the key terms at issue in this case, "Migraine," "Brain disease," or "headache," are defined within the VASRD and, therefore, are open to interpretation. See 38 C.F.R. §§ 4.124a, 4.130 (2005). The medical literature does not provide helpful definitions of the terms "Migraine," "Brain disease," or "headache," either, and even contains overlapping definitions. For example, the term "Migraine" is defined in Dorland's Illustrated Medical Dictionary (30th ed. 2003) as a type of headache, "an often familial symptom complex of periodic attacks of vascular headache, usually temporal and unilateral in onset, commonly associated with irritability, nausea, vomiting, constipation or diarrhea, and often photophobia." Dorland's Illustrated Medical Dictionary 1158. The term "Brain disease" is not generally defined in traditional medical dictionaries such as Dorland's Illustrated Medical Dictionary, however, the language included under DC 8045, "Brain disease due to trauma," implies, that headaches can be rated under DC 8045, through a combined rating of DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma." The note under DC 8045, "Brain disease due to trauma," states: "Purely subjective complaints such as headache, dizziness, insomnia, etc., recognized as symptomatic of brain trauma, will be rated 10 percent and no more under diagnostic code 9304." 38 C.F.R. § 4.124a (2005). Moreover, the term

---

[29] For example, the parties stipulated that on July 18, 2005 "Dr. Garcia diagnosed plaintiff with 'CLASSICAL MIGRAINE (WITH AURA): intractable with 1-2 prostrating headaches a week,'" during Mr. Adams' TDRL evaluation. (capitalization in original). In addition, Dr. Brooks, Dr. Marathe, First Lieutenant VanHemel, Dr. Friedman, Dr. Byrnes, as well as Mr. Adams' VA evaluators diagnosed plaintiff with migraines or migraine headaches. Although Dr. Tran also evaluated plaintiff on August 20, 2005, close in time to his October 24, 2005 informal PEB, this evaluation did not concern his migraine headaches.

"headache" is simply defined in Dorland's Illustrated Medical Dictionary as "pain in the head." Dorland's Illustrated Medical Dictionary 817.

The United States Court of Appeals for the Federal Circuit decision in <u>Deckers Outdoor Corp. v. United States</u>, provides some guidance when the <u>Russello</u> canon may not resolve individual term construction issues, when multiple, perhaps related, terms are in dispute, such as "migraine," "brain trauma," and "headache." <u>See Deckers Outdoor Corp. v. United States</u>, 14 F.3d 1363, 1365–67 (Fed. Cir.), <u>reh'g</u> and <u>reh'g en banc</u> <u>denied</u> (Fed. Cir. 2013), <u>cert.</u> <u>denied</u>, 134 S. Ct. 2288 (2014). In <u>Deckers</u>, the definitions of the terms "footwear," "shoes," and "boots" under the Harmonized Tariff Schedule of the United States (HTSUS) were at issue. <u>See</u> <u>id.</u> at 1367. The Federal Circuit, citing <u>Russello</u>, concluded that "footwear" could not have the same meaning as "shoes" or "boots," since the latter terms were used in other sections of the HTSUS, while, instead, "footwear" was used in the section at issue in the case. <u>See</u> <u>id</u>. Nonetheless, the Court of Appeals of the Federal Circuit still needed to define what exactly "footwear" meant, using explanatory notes contained within the HTSUS. <u>See</u> <u>id.</u> at 1367 n.1. The <u>Deckers</u> court concluded that "footwear" was not completely distinct from "shoes" or "boots," but instead encompassed both terms. <u>See</u> <u>id.</u> at 1367. The Federal Circuit stated:

> As Deckers acknowledges, the term "footwear" plainly encompasses both shoes and boots. <u>See</u> Br. of Appellant 8 (acknowledging that the Classic Crochet boots are "footwear with outer soles of rubber or plastic"). Certain HTSUS [Harmonized Tariff Schedule of the United States] provisions refer specifically to shoes. <u>See</u> HTSUS 6404.11 (referring to "tennis shoes," "basketball shoes," and "gym shoes"); <u>id.</u> 6403.19.30 (referring to "golf shoes"). Other HTSUS provisions refer specifically to "boots.").

<u>Id.</u>

In the above captioned case, defendant similarly argues that the terms "headache" and "Brain trauma" in the VASRD can be broadly defined, such that "migraine" conditions can fall within the definition of headaches, just as "shoes" and "boots" fell under the definition of "footwear" in <u>Deckers</u>. Defendant states: "Since the regulations include headaches as a type of 'brain disease due to trauma' for purposes of Diagnostic Code 8045, it defies reason for Mr. Adams to claim his headaches are not brain disease within the meaning of that diagnostic code."[30] Plaintiff, however, argues that migraines are a unique disease within the VASRD that should be rated under DC 8100, "Migraine," and that migraines are distinct from other types of "headaches" or "Brain disease." According to plaintiff, "the word 'migraines' is a disability, and it was exclusively used by VA in promulgating the VASRD in the title to DC 8100 and was

---

[30] Defendant frequently refers to plaintiff's condition as "post-concussive headaches," although the 2011 PDBR majority and minority decisions both referred to plaintiff's condition as "Post-Concussive Migraine Headaches."

used nowhere else in the VASRD." Given the lack of direct definitions provided in the VASRD, it is not apparent from reading the words of the VASRD whether the disabilities covered by DC 8045, "Brain disease due to trauma," or DC 9304, "Dementia due to head trauma," cover migraine conditions. See 38 C.F.R. §§ 4.124a, 4.130 (2005).

Plaintiff argues that another term in the VASRD, "Dementia," is of relevance to plaintiff's disability determination. The term "Dementia" is found in the title of DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma." Unlike other terms in the VASRD, the term "Dementia" is defined within the VASRD. The start of 38 C.F.R. § 4.130 (2005) states: "The nomenclature employed in this portion of the rating schedule is based upon the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, of the American Psychiatric Association (DSM–IV)." The DSM-IV defines "**Dementia**" (emphasis in original), in relevant part, as follows:

> The essential feature of a dementia is the development of multiple cognitive deficits that include memory impairment and at least one of the following cognitive disturbances . . . .
>
> Memory impairment is required to make the diagnosis of a dementia and is a prominent early symptom (Criterion A1). Individuals with dementia become impaired in their ability to learn new material, or they forget previously learned material. Most individuals with dementia have both forms of memory impairment . . . .

DSM-IV at 134; see also 61 Fed. Reg. 52695, 52695–96 (Oct. 6, 1996) (discussing the use of DSM-IV, as well as the VA's interpretation of other diagnostic codes that also use the word "dementia"). The DSM-IV further defines "**Dementia Due to Head Trauma**" (emphasis in original), in relevant part, as follows:

> The essential feature of Dementia Due to Head Trauma is the presence of a dementia that is judged to be the direct pathophysiological consequence of head trauma. . . . Posttraumatic amnesia is frequently present, along with persisting memory impairment.

DSM-IV at 148 (emphasis in original).

As part of its consideration of plaintiff's case, this court issued an Order asking the parties to clarify "whether the record indicates that plaintiff suffered from memory impairment as a result of head trauma, and, if not, whether DC 8045, 'Brain disease due to trauma,' was properly applied to plaintiff's condition . . . ." The court asked the parties to discuss whether, "[i]n order for DC 8045, 'Brain disease due to trauma,' to have been applicable to plaintiff's condition at the time of the 2005 PEB decision, therefore, there may have been a requirement to have diagnosed plaintiff with memory impairment as a result of trauma." Both parties confirmed that at no point in the record is there evidence that plaintiff suffered from memory loss or memory impairment. Defendant indicated:

"Our review of the record did not disclose evidence that Mr. Adams suffered from memory loss." Similarly, plaintiff stated: "The administrative record contains no evidence that the plaintiff suffered from memory impairment as a result of trauma."

Plaintiff argues that because plaintiff did not show any signs of memory loss, plaintiff did not suffer from dementia, and therefore, the plain language of DC 9304, "Dementia due to head trauma," prevented plaintiff's condition from being rated analogously under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma." Defendant responds that, pursuant to the descriptive language under DC 8045, "Brain disease due to trauma," a rating under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to the head trauma," only requires the presence of a purely subjective complaint, such as headaches or dizziness. According to defendant:

> Although the code cross-references DC 9304, Dementia Due to Head Trauma (38 C.F.R. § 4.130) for purposes of designating the applicable disability percentage, it does not mandate further evaluation of the condition through DC 9304 for purposes of receiving a 10 percent rating. Because Mr. Adams suffered from a "purely subjective" headache condition, DC 8045 does not require satisfaction of two diagnostic codes: DC 8045 ["Brain disease due to trauma,"] and DC 9304 ["Dementia due to head trauma"]; rather, DC 8045 ["Brain disease due to trauma,"] only requires the presence of headaches.

Defendant also maintains that, regardless, to qualify for a disability rating of ten percent under DC 9304, "Dementia due to head trauma," alone, no showing of memory loss is required. Defendant notes that under the "General Rating Formula for Mental Disorders," which provides the disability rating scheme for DC 9304, "Dementia due to head trauma," a disability rating of ten percent only requires: "Occupational and social impairment due to mild or transient symptoms which decrease work efficiency and ability to perform occupational tasks only during periods of significant stress, or; symptoms controlled by continuous medication." 38 C.F.R. § 4.130 (2005). Defendant notes, on the other hand, that the next rating under DC 9304, "Dementia due to head trauma," of thirty percent, specifically looks for "mild memory loss (such as forgetting names, directions, recent events)" as a rating requirement. See id.

Under the DSM-IV's definition of "**Dementia Due to Head Trauma**" "memory impairment" is "frequently present," but does not have to be present in every instance. See DSM-IV at 148 (emphasis in original). Moreover, according to the note under DC 8045, "Brain disease due to trauma," as written at the time of plaintiff's separation in 2005: "Purely subjective complaints such as headache, dizziness, insomnia, etc., recognized as symptomatic of brain trauma, will be rated 10 percent and no more under diagnostic code 9304." 38 C.F.R. § 4.124a (2005). It appears, therefore, from a review of the plain language of the VASRD that "[p]urely subjective complaints such as headache, dizziness, insomnia," are among the diagnoses which potentially can

generate a rating under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma." See 38 C.F.R. §§ 4.124a, 4.130 (2005).

Defendant also correctly notes that under the "General Rating Formula for Mental Disorders," which provides the disability ratings for DC 9304, "Dementia due to head trauma," a disability rating of ten percent under DC 9304 does not require memory impairment. See 38 C.F.R. § 4.130 (2005). Only for ratings of thirty percent or higher under DC 9304, "Dementia due to head trauma," does the 2005 VASRD "General Rating Formula for Mental Disorder" mention or require memory impairment as a symptom. See id. The court also points out that the United States Court of Appeals for Veterans Claims has upheld ratings for headache conditions under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma," despite a lack of a showing of memory loss. See, e.g., Ashmore v. Derwinski, 1 Vet. App. 580, 583–84 (1991) (in which the court recommended the Board of Veterans Appeals rate plaintiff's symptoms of headache, dizziness, and insomnia as ten percent disabling under DC 8045-9304, despite no mention of the service member suffering memory loss).

According to plaintiff, even if the plain language of the VASRD does not clarify whether or not plaintiff's migraine condition should have been rated under DC 8100, "Migraine," or DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma," the Secretary of the Army's decision is contrary to the controlling interpretations of the VASRD issued by the United States Court of Appeals for Veterans Claims and the Board of Veterans Appeals. Plaintiff contends that these interpretations were not considered during Mr. Adams' 2011 PDBR review. Plaintiff points to section 1642 of the Wounded Warrior Act (codified at 10 U.S.C. § 1216a). According to section 1642 of the Wounded Warrior Act, in relevant part:

"(a) UTILIZATION OF VA SCHEDULE FOR RATING DISABILITIES IN DETERMINATIONS OF DISABILITY.—"(1) In making a determination of disability of a member of the armed forces for purposes of this chapter, the Secretary concerned
    "(A)   shall, to the extent feasible, utilize the schedule for rating disabilities in use by the Department of Veterans Affairs [38 C.F.R. Part 4] , including any applicable interpretation of the schedule by the United States Court of Appeals for Veterans Claims; and
    "(B)   except as provided in paragraph (2), may not deviate from the schedule or any such interpretation of the schedule.

Wounded Warrior Act § 1642 (capitalization and quotations in original). Plaintiff, therefore, argues that: "In the 2008 NDAA [National Defense Authorization Act, of which the Wounded Warrior Act is a part], Congress expanded on the principle that PEBs are required to follow the VASRD by providing that both the PEBs and the newly created PDBR are generally bound to follow VA interpretations of its own VASRD."

The Wounded Warrior Act was enacted on January 28, 2008, after plaintiff's 2005 informal PEB review, but before his 2011 PDBR review. Defendant does not disagree that section 1642 of the Wounded Warrior Act applies to plaintiff's PDBR. DoDI 6040.44, "Lead DoD Component for the Physical Disability Board of Review (PDBR)," offers different approaches for the PDBR to follow depending on whether a claimant was separated before or after January 28, 2008:

> If the case was adjudicated by the final Military Department PEB and the covered individual was separated from military service prior to January 28, 2008 [the date of enactment of the Wounded Warrior Act], the PDBR shall also review the disability rating(s) of the covered individual, in accordance with the VASRD in effect at the time of separation for the covered individual. Provisions of DoD or Military Department regulations or guidelines relied upon by the PEB will not be considered by the PDBR to the extent they were inconsistent with the VASRD in effect at the time of the adjudication. If the covered individual was separated from military service on or after January 28, 2008, the PDBR shall use the VASRD without application of Reference (m), along with any applicable interpretation of the VASRD by the United States Court of Appeals for Veterans Claims.

DoDI 6040.44, Enclosure 3 § 5(e)(1).[31] According to the military's instruction, when the PDBR evaluated claimants who happened to have separated from the Army before January 28, 2008, the date of enactment of the Wounded Warrior Act, the PDBR was not required to rate the claimants in the same manner as VA and was not required to

---

[31] As mentioned above, this court refers to DoDI 6040.44, as amended June 2, 2009, in effect at the time of plaintiff's 2011 PDBR review. Before DoDI 6040.44 was amended on June 2, 2009, the instruction at Enclosure 3 § 5(e)(1) stated:

> If the case was adjudicated by the final Military Department PEB and the covered individual was separated from military service prior to January 28, 2008, the PDBR shall also review the disability rating(s) of the covered individual, in accordance with the DoD application of the VASRD under DoDI 1332.39 (Reference (m)) and applicable Service regulations, if any, in effect at the time of separation for the covered individual. If the covered individual was separated from military service on or after January 28, 2008, the PDBR shall use the VASRD without application of Reference (m), along with any applicable interpretation of the VASRD by the United States Court of Appeals for Veterans Claims.

DoDI 6040.44, Enclosure 3 § 5(e)(1) (June 27, 2008 Rev.). When DoDI 6040.44 was amended June 2, 2009, no reason was given in the revised instruction for the change in language.

refer to interpretations of the VASRD by the United States Court of Appeals for Veterans Claims. See id. For those service members who separated after January 28, 2008, however, the PDBR was required under DoDI 6040.44 to rate the claimants in a manner that followed the VA rating scheme, including any relevant interpretations of the VASRD issued by the United States Court of Appeals for Veterans Claims.[32] See id.

A review of the record indicates that since plaintiff separated from the Army on November 21, 2005, plaintiff's 2011 PDBR followed the guidelines set forth in DoDI 6040.44 applicable to claimants who separated from the Army prior to January 28, 2008. The PDBR majority stated: "IAW [in accordance with] DoDI 6040.44, provisions of DoD or Military Department regulations or guidelines relied upon by the PEB will not be considered by the Board to the extent they were inconsistent with the VASRD in effect at the time of the adjudication." A review of the record further indicates that plaintiff's 2011 PDBR majority and minority decisions did not refer to any decisions of the United States Court of Appeals for Veterans Claims or Board of Veterans Appeals, when determining how to interpret the competing terms of the VASRD at issue, DC 8100, "Migraine," and DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma."

In contrast to the Army's instruction in DoDI 6040.44, Enclosure 3 § 5(e)(1), however, the language in section 1642 of the Wounded Warrior Act indicates that the Secretary, in making a determination of a disability of a member of the armed forces, "to the extent feasible," shall utilize the schedule for rating disabilities in use by the Department of Veterans Affairs, 38 C.F.R. Part 4, including any applicable interpretation of the schedule by the United States Court of Appeals for Veterans Claims, and should not deviate except in specific circumstances not applicable here. See Wounded Warrior Act § 1642. The long-standing presumption is that when a public law is enacted, it is in effect immediately, unless otherwise indicated. See Lapeyre v. United States, 84 U.S. 191, 198 (1872) (stating that "it is settled that where no other time is prescribed," acts of Congress "take effect from their date"). Because Wounded Warrior Act § 1643, which established the PDBR, enabled the Secretary of the Army to make "de novo" determinations regarding the disability rating of a service member, those determinations are subject to the requirements of Wounded Warrior Act § 1642. See Hatmaker v. United States, 2014 WL 3767049, at *8; Silbaugh v. United States, 107 Fed. Cl. at 150; see also Wounded Warrior Act § 1643 (stating that the military secretary concerned will "correct the military records of a covered individual"); DoDI 6040.44 § 4(a), Enclosure 3 § 4(b) (stating that the PDBR shall "reassess" and "impartially readjudicate cases upon which review is requested").

The court notes that the legislative history behind the Wounded Warrior Act supports a conclusion that the requirements of section 1642 of the Wounded Warrior

---

[32] The military's instruction to Mr. Adams' PDBR, to refer to the VASRD in effect at the time of his separation from the Army, which in Mr. Adams' case would be the VASRD in effect on November 21, 2005, is not challenged by plaintiff.

Act applies to all PDBR reviews, not just to those reviews for service members who were separated from the military after January 28, 2008, the date the Wounded Warrior Act was enacted. The legislative history indicates that the PDBR was created to be "an independent board to review," and "correct unjustifiably low Department of Defense disability ratings awarded since 2001." See 153 Cong. Rec. S. 9857, 9858 (July 25, 2007) (statement of Senator Carl Levin). The legislative history further indicates that Congress believed the military's ratings were "unjustifiably low" specifically because the military's disability rating system was flawed, and, therefore, enactment of section 1642 of the Wounded Warrior Act was to encourage the military to adopt the VA's rating approach for all disability determinations. See id.

Plaintiff states that "[t]he provisions of the 2008 NDAA creating the PDBR had their genesis in the joint hearing conducted the previous year [2007] by the Senate Committees on Armed Services and Veterans Affairs," citing to the joint Senate hearing, Hearing to Receive Testimony on the Department of Defense and Veterans Affairs Disability Rating Systems and the Transition of Servicemembers from the Department of Defense to the Department of Veterans Affairs, S. Hrg. 110-212 (Apr. 12, 2007). The April 2007 Senate Hearing focused on disparities between VA and DoD disability ratings. See generally id. Senator Carl Levin, Chairman of the Senate Committee on Armed Services, stated at the start of the hearing that, "[d]isability ratings by the military services are inconsistent with disability ratings by the VA," noting that there appeared to be significant disparities in support received by those with disability ratings thirty percent or above and those with disability ratings below thirty percent. See id. at 2. A "study," prepared by the Center for Naval Analysis upon request from the Veteran's Disability Benefits Commission, was discussed at the hearing, and indicated that the military, across all branches, consistently rated service members significantly lower than the VA.[33] See id. at 97–104. In particular, migraine was one of the disabilities identified as consistently rated lower by the military than by the VA. See id. at 103–04 (finding that when the DoD rated a migraine condition as 0–20% disabling, the VA rated the same migraine condition as between 30–50% disabling 73% of the time). General James Terry Scott, Chairman of the Veterans' Disability Benefits Commission, presented the results of the study as part of his prepared statement. General Scott further testified: "It is also apparent that DoD has strong incentive to assign ratings less than 30% so that only separation pay is required and continuing family health care is not provided." Id. at 104. General Scott's final recommendations included having the VA directly rate service members. Id. at 105 ("If a servicemember is found unfit, the servicemember's case should be referred to VA before discharge. . . . VA would rate and assign the percentage of disability of all service-connected disabilities found on exam."). Senator Levin described the lower military ratings, especially when they meant the service member was not able to seek "medically retired" status, as "just unfair." See id. at 2,

---

[33] At the hearing, it was stated by General Scott that the purpose of the Commission was to study "the benefits available for disabilities and deaths related to military service, more specifically the appropriateness of the level of the benefits, and how a decision is made whether to compensate a veteran." S. Hrg. 110-212, at 96.

126. The issue of how to improve consistency between the different ratings was discussed at length. See generally id. at 126–70.

In the same hearing, there was discussion about what would eventually become the creation of the PDBR. Senator John McCain, at the time Ranking Member of the Senate Committee on Armed Services, discussed legislation to "provide independent review on request from any service member who has received less than a 30 percent rating, in response to accusations that junior enlisted have been systematically low-balled in the disability ratings they have been offered and been denied the benefits of a medical retirement." Id. at 6. Senator McCain also remarked: "There appears to be consensus, for example, that the current decentralized disability evaluation systems for the Army, Navy, Air Force, and Marines have received very little oversight from DOD and have produced questionable outcomes for many severely wounded soldiers." Id.

Appended to the April 2007 Senate Hearing transcript was a statement prepared by Brian Lawrence, Assistant National Legislative Director, Disabled Americans Veterans. See id. at 171. The statement alleged that "PEB's do not adhere to the VA Schedule for Rating Disabilities (VASRD) as required by chapter 61 of title 10 United States Code because some in DOD assert that the law is ambiguous." Id. The report sought legislation to "make unmistakably clear that there is only one rating schedule, the one adopted by the Department of Veterans Affair [sic], that the DOD does not have the authority to modify that schedule, and that decisions of the Court of Appeals for Veterans Claims interpreting the rating schedule must be followed by the DOD." Id. at 172.

A few months after the April 2007 joint Senate Hearing, on October 17, 2007, the Senate Committee on Veterans' Affairs held another hearing, titled Hearing On VA and DoD Collaboration: Report of The President's Commission on Care for America's Returning Wounded Warriors; Report of the Veterans Disability Benefits Commission; and Other Related Reports. S. Hrg. 110-374, 74–81 (Oct. 17, 2007). At this this hearing, Togo D. West, Jr., "Co-Chair of the Department of Defense's Independent Review Group on Rehabilitative Care and Administrative Processes at Walter Reed Army Medical Center and National Naval Medical Center," and a prior Secretary of the Department of Veterans Affairs, issued a prepared statement discussing a range of topics, including "cooperation between the DOD and VA." See id. at 43, 78. The prepared statement by Mr. West including a statement that: "The current Medical Evaluation Board/Physical Evaluation Board process is extremely cumbersome, inconsistent, and confusing to providers, patients, and families." See id. at 80. The prepared statement also mentioned that: "Not all the general policy provisions set forth in the rating schedule apply to the military. Consequently, disability ratings consistently vary between the Department of Defense and Department of Veterans Affairs." Id. The Independent Review Group recommended, in response, both implementing a PDBR-type system and unifying the rating process between the VA and military in conjunction:

The Under Secretary of Defense (Personnel & Readiness) should conduct a quality assurance review all [sic] (Army, Navy/Marine Corps, and Air Force) Disability Evaluation System decisions of 0, 10, or 20 percent disability and Existed Prior to Service (EPTS) cases since 2001 to ensure consistency, fairness, and compliance with applicable regulations.

. . .

The Secretary of Defense and the Secretary of Veterans Affairs should establish one solution. Develop and utilize one disability rating guideline that remains flexible to evolve and be updated as the trends in injuries and supporting medical documentation/treatment necessitate.

Id.

Also of relevance to the issues before the court is a December 6, 2007, House of Representatives conference committee report, which appears to concur with the statements made at the April and October 2007 Senate Hearings. See H.R. Rep. No. 110-477, at 1164–65 (Dec. 6, 2007) (Conf. Rep.) (stating that the House of Representatives, in conference, "recedes" to the Senate's proposed language of Wounded Warrior Act §§ 1642 and 1643, although with minor amendments related to notification requirements). The December 6, 2007 conference committee report, when discussing section 1643 of the Wounded Warrior Act, specifically mentioned and endorsed an October 2007, Veterans' Disability Benefits Commission report, which presented results in line with the prepared statements by General Scott, Chairman of the Veterans' Disability Benefits Commission, which were presented to the Senate Committees on Armed Services and Veterans Affairs on April 12, 2007. The conference committee report stated:

The conferees believe that the recommendation of the Veterans' Disability Benefits Commission in its report of October 3, 2007, to reassess the ratings of service members who were discharged as unfit but given low ratings should be implemented. The Commission's analysis of service disability ratings from 2000 to 2006 set forth in chapter V [titled "Policies for Determining Eligibility for Benefits"] of its report reflected disturbing and "counterintuitive" differences between the Army and Marine Corps and the Navy and Air Force that must be addressed. The conferees expect the Secretary of Defense to ensure that cases before the Physical Disability Board of Review receive equitable ratings as recommended by the Commission.

Id. at 1164–65.

The October 2007 Veterans' Disability Benefits Commission report, titled "**Honoring the Call to Duty: Veterans' Disability Benefits in the 21st Century**," Vet.

Disability Benefits Comm'n (Oct. 2007), covered the same topic as the April 2007 study presented by General Scott: the military's separate approach from the VA to rating veterans. The report stated:

> DoD and VA need to assess the differences in the application of the Rating Schedule. The Congressional Commission [on Servicemembers and Veterans Transition Assistance Report, January 24, 1999] documented that "the two systems apply different standards because they make determinations for different purposes." The [Congressional Commission] report recommended that, "a combined DoD/VA Disability Evaluation Rating Board would avoid redundancy." This coordination of efforts could make sure that both military service members and veterans are receiving a consistent disability rating and compensation.

Id. at 259 (footnotes omitted). The report also stated:

> As illustrated . . . the combined disability ratings made by VA are higher, on average, than the combined ratings made by the services at almost all rating levels. Individuals who received ratings of less than 30 percent and who had fewer than 20 years of service received severance pay only. Individuals assigned a zero percent rating by the services received, on average, a 30 percent rating from VA. Individuals rated 30 percent by the services were rated an average of 56 percent by VA. The difference between VA and DoD ratings is even more pronounced for those individuals rated less than 30 percent by DoD but eligible for retirement with 20 or more years of service . . . .

Id. at 266. According to the report, "there appears to be some incentive on the part of the services to assign ratings less than 30 percent so that only separation pay is required and continuing family health care and other retirement benefits are not provided." Id. at 267. The Veterans' Disability Benefits Commission concluded, after studying the issue:

> The Commission believes that the responsibility for assigning a disability rating should be turned over to VA and that the MEB/PEB structure should be streamlined. These changes would give each service member a single, objective rating that would apply to military disability retirement pay or severance pay as well as VA disability compensation.

Id. at 268. The Commission included as part of its "**Short-Term Recommendations**:"

> **Recommendation 7.10**
>
> **VA and DoD should adopt a consistent and uniform policy for rating disabilities, using the VA Schedule for Rating Disabilities.**

**Recommendation 7.11**

**DoD should reassess the ratings of service members who were discharged as unfit but rated 0 to 30 percent disabled to determine if those ratings were equitable. (Note: Commission data only went back to 2000.)**

Id. at 269 (emphasis in original).

Other statements on the floor of Congress are in line with the congressional indications of intent discussed above. In March, 2007, on the floor of the United States House of Representatives, Representative Robert Andrews, a member of the House Armed Services Committee, speaking on the Wounded Warriors Act, stated that "this bill deals with the outrageous inconsistency that so many people have experienced in the disability system . . . ." 153 Cong. Rec. H. 3206, 3209 (Mar. 28, 2007). Representative Ike Skelton, Chairman of the House Armed Services Committee, and a sponsor of the National Defense Authorization Act for Fiscal Year 2008, added: "[A]s the gentleman from New Jersey (Mr. Andrews) stated about the disparity between the treatment regarding the disability ratings made by the Department of Defense on the one hand, and the Veterans Administration on the other, we hope that disparity will be done away with by the legislation that we pass today." Id.; see also id. at 3218 (Representative Terry Everett stated: "Having spent years on the House Armed Services Committee and the Committee on Veterans' Affairs, I have seen first hand the need for improved lines of communication between the Department of Defense and the Department of Veterans Affairs," and added: "Another great concern of mine comes from the inconsistencies between the two departments' disability ratings systems. When given a different rating of disability as a member of the military than as a civilian, disparities are bound to arise in what benefits can be expected. Creating a single, standardized rating system will help ensure that both our military personnel and our veterans receive the best care that our government can provide.").

In July of 2007, on the Senate floor, Senator Levin made the following comments, referencing both what would become both the PDBR and section 1642 of the Wounded Warrior Act, as well as other efforts to align the VA and Army rating systems:

This bill addresses the issue of inconsistent disability ratings by requiring that the military departments use VA standards for rating disabilities unless the Department of Defense rating is higher. The bill adopts a more favorable statutory presumption for determining whether a disability is incident to military service by adopting the more favorable VA presumption. The bill requires two pilot programs to test the viability of involving the Veterans' Administration in the assignment of disability ratings for the Department of Defense. The bill also establishes an

> independent board to review and, where appropriate, correct unjustifiably low Department of Defense disability ratings awarded since 2001.

153 Cong. Rec. S. 9857, 9858 (July 25, 2007). Senator McCain also stated on the Senate floor that the National Defense Authorization Act of Fiscal Year 2008 "bridges the gap in health care coverage for the severely wounded," and, speaking about the future PDBR, "empowers a special board to review disability ratings of 20 percent or less, and to restore to wounded soldiers, if appropriate, a higher disability rating or retired status." See id. Finally, shortly before the National Defense Authorization Act for Fiscal Year 2008 was enacted, Senator Levin made another statement about the legislation in January of 2008:

> To improve the disability evaluation system, the bill will require the military departments to use VA standards when making disability determinations, authorizing deviation from these standards only when it will result in a higher disability rating for the service member, and will require the services to take into account all medical conditions that render a member unfit for duty.

154 Cong. Rec. S. 53 (Jan. 22, 2008).

In fact, the Department of Defense admitted before the passage of the Wounded Warrior Act that the military's rating system was flawed. At the April 12, 2007 Senate Hearing discussed above, Deputy Secretary of Defense Gordon England, accompanied by David Chu, Under Secretary for Personnel and Readiness, stated that "it is evident that some of our valued servicemen and women, and particularly those with war injuries, are not receiving the benefits they deserve." S. Hrg. 110-212, at 11. In response to questions by Senator Hillary Clinton, Under Secretary Chu, the person who eventually would issue and sign DoDI 6040.44, stated: "DOD needs authority to revolutionize DES [the disability evaluation system] rather than a new set of compliance standards that only serve to reinforce the present, failed system." Id. at 42; see also DoDI 6040.44 § 8, Under Secretary Chu also argued for increased cooperation between the VA and military. See id. at 42.

According to DoDI 6040.44, when reviewing separations that occurred before January 28, 2008, such as in plaintiff's case, the PDBR was instructed to rely on DoD or Amy regulations used by the PEB unless "they were inconsistent with the VASRD in effect at the time of the adjudication." See DoDI 6040.44, Enclosure 3 § 5(e)(1). The instruction contained no requirement to refer or rely on interpretations of the VASRD by the Court of Appeals for Veterans Claims, in regards to reviews of service members who separated from the military before January 28, 2008, such as Mr. Adams. The instruction did not lay out the Army's reasoning as to why this different approach was chosen. In this instruction, therefore, the Army did not demonstrate the necessary "'thoroughness evident in its consideration.'" See Warner-Lambert Co. v. United States, 425 F.3d 1381, 1384 (Fed. Cir. 2005) (quoting Skidmore v. Swift & Co., 323 U.S. 134,

140 (1944)). Furthermore, Mr. Adams' 2011 PDBR did not add address the issue or add additional supporting rationale for its decision, merely quoting the requirement from the instruction: "IAW [in accordance with] DoDI 6040.44, provisions of DoD or Military Department regulations or guidelines relied upon by the PEB will not be considered by the Board to the extent they were inconsistent with the VASRD in effect at the time of the adjudication." The instruction's approach generally contradicts the spirit and intent of Congress. See S. Hrg. 110-212, at 6, 105, 172 (indicating that the Wounded Warrior Act's purpose was to rectify prior, "unjustifiably low" ratings given by military reviewers, by affirmatively adopting the VA rating scheme). There is significant legislative evidence that Congress wanted to have the PDBR rely on the more generous VA approach for rating disabilities. The Veterans' Disability Benefits Commission report, specifically endorsed by Congress in its December 6, 2007 conference report section discussing Wounded Warrior Act § 1643, stated: "**VA and DoD should adopt a consistent and uniform policy for rating disabilities, using the VA Schedule for Rating Disabilities**" right before it recommended creating the PDBR. See Honoring the Call to Duty: Veterans' Disability Benefits in the 21st Century, Vet. Disability Benefits Comm'n, at 269 (emphasis in original); see also H.R. Rep. No. 110-477, at 1164–65.

In addition, Mr. West, "Co-Chair of the Department of Defense Independent Review Group on Rehabilitative Care and Administrative Processes at Walter Reed Army Medical Center and National Naval Medical Center," stated in his report to the United States Senate on October 17, 2007:

> The Secretary of Defense and the Secretary of Veterans Affairs should establish one solution. Develop and utilize one disability rating guideline that remains flexible to evolve and be updated as the trends in injuries and supporting medical documentation/treatment necessitate.

S. Hrg. 110-374, at 74–81. When the military promulgated DoDI 6040.44, however, the instruction did not do this, but allowed for more limited review for soldiers whose separation occurred before January 28, 2008, by allowing the PDBR to use military regulations as long as they were not "inconsistent with the VASRD in effect at the time of the adjudication," with no mention of the PDBR having to refer to decisions by the United States Court of Appeals for Veterans Claims or Board of Veterans Appeals. See DoDI 6040.44, Enclosure 3 § 5(e)(1). Considering that the PDBR only is empowered to review cases of service members who are separated from the military between September 11, 2001, and December 31, 2009, this January 28, 2008 cutoff means a significant number of PDBR applicants would not receive the intended benefits presumably afforded to them under section 1642 of the Wounded Warrior Act, including the benefit of favorable interpretations of the VASRD by the United States Court of Appeals for Veterans Claims or Board of Veterans Appeals. See Wounded Warrior Act §§ 1642, 1643.

The government has not argued to this court that Wounded Warrior Act § 1642 does not apply to plaintiff's case. With regards to implementation of a statute, the United States Supreme Court has stated:

> In our view the agency's policy statements, embodied in its compliance manual and internal directives, interpret not only the regulations but also the statute itself. Assuming these interpretive statements are not entitled to full <u>Chevron</u> deference,[34] they do reflect "'a body of experience and informed judgment to which courts and litigants may properly resort for guidance.'" <u>Bragdon v. Abbott</u>, 524 U.S. 624, 642, 118 S. Ct. 2196, 141 L.Ed.2d 540 (1998) (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134, 139–140, 65 S. Ct. 161, 89 L. Ed. 124 (1944)). As such, they are entitled to a "measure of respect" under the less deferential <u>Skidmore</u> standard.

<u>Fed. Express Corp. v. Holowecki</u>, 552 U.S. 389, 399 (2008). <u>Skidmore</u> deference can be warranted for an administrative action depending on the "'thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.'" <u>Warner-Lambert Co. v. United States</u>, 425 F.3d at 1384 (quoting <u>Skidmore v. Swift & Co.</u>, 323 U.S. at 140); <u>see also</u> <u>Vance v. Ball State Univ.</u>, 133 S. Ct. 2434, 2461 (2013) (giving the Equal Employment Opportunity Commission's guidance document "respect proportional to its 'power to persuade.'" (citation omitted)); <u>United States v. Mead Corp.</u>, 533 U.S. 218, 228 (2001) ("The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position." (footnotes omitted)). After a careful review, the instruction in DoDI 6040.44, Enclosure 3 § 5(e)(1), separating PDBR applicants into two groups, and only giving one group the full benefit of Wounded Warrior Act § 1642's guidance and requirements, appears to have been arrived at without the careful consideration required, and is inconsistent with the military's own prior statements before Congress. Thus, DoDI 6040.44 should not be due agency deference as the court considers plaintiff's case.

---

[34] The government did not raise a <u>Chevron</u> deference argument before this court. Nonetheless, <u>Chevron</u> deference does not appear to be appropriate for DoDI 6040.44, as the intention of section 1642 of the Wounded Warrior Act to apply to all PDBR determinations is clear from a plain reading of the statute. "'[I]f a court, *employing traditional tools of statutory construction*, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.'" <u>United States v. Home Concrete & Supply, LLC</u>, 132 S. Ct. 1836, 1844 (2012) (quoting <u>Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.</u>, 467 U.S. at 843 n.9) (emphasis in original). In addition, the court notes that DoDI 6040.44 was not promulgated through notice and comment proceedings, as is generally required for an agency's regulations or instructions to be given <u>Chevron</u> deference.

The court also notes that "interpretive doubt" regarding the reading of a statute pertaining to veterans "is to be resolved in the veteran's favor." See Brown v. Gardner, 513 U.S. 115, 118 (1994) (citing King v. St. Vincent's Hosp., 502 U.S. 215, 220–21 n.9 (1991) ("[P]rovisions for benefits to members of the Armed Services are to be construed in the beneficiaries' favor." (citing Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 285 (1946)))); Viegas v. Shinseki, 705 F.3d 1374, 1380 (Fed. Cir. 2013) ("[Brown v.] Gardner makes clear that if there is any ambiguity regarding the prerequisites for compensation under [38 U.S.C.] section 1151, 'interpretive doubt [must be] resolved in the veteran's favor.'" (second modification in original)); Sursely v. Peake, 551 F.3d 1351, 1355 (Fed. Cir. 2009) ("In veterans benefits cases, 'interpretive doubt is to be resolved in the veteran's favor.'" (quoting Brown v. Gardner, 513 U.S. at 118)). "[M]odifying the traditional Chevron analysis is the doctrine governing the interpretation of ambiguities in veterans' benefit statutes—that "interpretative doubt is to be resolved in the veteran's favor . . . ." Disabled Am. Vets. Gober, 234 F.3d 682, 692 (Fed. Cir. 2000) (quoting Brown v. Gardner, 513 U.S. at 118); see also Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs, 260 F.3d 1365, 1378 (Fed. Cir. 2001) (applying the Chevron doctrine after considering whether, under Brown v. Gardner, "'interpretive doubt is to be resolved in the veteran's favor,'" but finding no resolution (quoting Brown v. Gardner, 513 U.S. at 118)). But see Spicer v. Shinseki, 752 F.3d 1367, 1371 (Fed. Cir. 2014) (quoting Nielson v. Shinseki, 607 F.3d 802, 808 (Fed. Cir. 2010) for the proposition that "'[t]he mere fact that the particular words of the statute standing alone might be ambiguous does not compel us to resort to the Brown [v. Gardner] canon'"); Sursely v. Peake, 551 F.3d at 1355 (resorting to the Brown v. Gardner only after deciding that both then Chevron and Skidmore doctrines do not apply); Haas v. Peake, 544 F.3d at 1308 ("Thus, although Mr. Haas argues that the Brown [v. Gardner] doctrine effectively means that the DVA is not entitled to deference if its rulemaking resolves a statutory ambiguity, this court's precedent is to the contrary."); Sears v. Principi, 349 F.3d 1326, 1331 (Fed. Cir. 2003) (indicating that the Chevron doctrine trumps the Gardner canon, stating: "Indeed, even assuming a DVA regulation sometimes operated inconsistently with the pro-claimant policy underlying the statute, the appellant has not cited, nor have we found, a single case in which this court has invalidated a regulation that would otherwise be entitled to Chevron deference on this ground"), cert. denied, 541 U.S. 960 (2004). The United States Court of Appeals for the Federal Circuit has also cautioned that,

> "a veteran 'cannot rely upon the generous spirit that suffuses the law generally to override the clear meaning of a particular provision.'" Id. [Disabled Am. Vets. Gober, 234 F.3d at 692] (citations omitted). Even where the meaning of a statutory provision is ambiguous, we must take care not to invalidate otherwise reasonable agency regulations simply because they do not provide for a pro-claimant outcome in every imaginable case.

Sears v. Principi, 349 F.3d at 1331; DeBeaord v. Principi, 18 Vet. App. 357, 364 (2004). Nonetheless, as discussed above, the Department of Defense's instruction does not warrant deference.

Relevant United States Court of Appeals for Veterans Claims cases clarify the meaning and application of the VASRD diagnostics codes at issue in plaintiff's case regarding his "Post-Concussive Migraine Headaches" condition: DC 8100, "Migraine," and DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma." Plaintiff asserts that numerous Court of Appeals for Veterans Claims decisions "demonstrate that the proper interpretation of the VASRD is that post-concussive migraine headaches should be rated under DC 8100, ['Migraine,'] not DC 8045 ['Brain disease due to trauma]," and contends that the Secretary of the Army's adoption of the 2011 PDBR minority decision was arbitrary and capricious by failing to consider and address these decisions. Defendant responds that the Court of Appeals for Veterans Claims' interpretation of "Migraine" and "headache" align with the 2011 Secretary of the Army's conclusion and 2011 PDBR minority decision. According to defendant, "[c]ontrary to Mr. Adams's repeated assertions that his condition can only be rated under Diagnostic Code 8100, the Veterans Court has affirmed the BVA's [Board of Veterans Appeals'] alternative consideration of a claimant's condition under either Diagnostic Code 8045 or 8100."

Plaintiff cites to six unpublished decisions issued by the Court of Appeals for Veterans Claims affirming Board of Veterans Appeals decisions to rate a veteran's migraines, caused by trauma, under DC 8100, "Migraine," which plaintiff asserts supports his view that post-concussive migraine headaches should be rated under DC 8100, "Migraine." See Garcia v. Shinseki, No. 11-3074, 2013 WL 388989, at *2, *6 (Vet. App. Feb. 1, 2013) (unpublished) (finding that the Board of Veterans Appeals "did not err in applying DC 8100 ["Migraine" (2010 rev.)] to the appellant's case," when the veteran was diagnosed with "migraine headache disorder"); Johnson v. Shinseki, No. 11-2261, 2012 WL 3089715, at *2, *6 (Vet. App. July 31, 2012) (unpublished) (affirming the Board of Veterans Appeals' decision to rate the veteran's migraines under DC 8100, "Migraine" (2012 rev.), which developed after a head injury); Kaiser v. Shinseki, No. 08-4039, 2010 WL 675259, at *2 (Vet. App. Feb. 23, 2010) (unpublished) (affirming the Board of Veterans Appeals' rating of thirty percent under DC 8100, "Migraine" (2009 rev.), for the veteran's "migraine headaches, which he believes derive from the 1956 automobile accident"); Ivory v. Shinseki, No. 07-0924, 2009 WL 490003, at *2 (Vet. App. Feb. 27, 2009) (unpublished) (affirming a judgment for post-traumatic headaches under DC 8100, "Migraine" (2008 rev.)); Camper v. Mansfield, 26 Vet. App. 66, 2007 WL 4487777, at *3 (Nov. 29, 2007) (unpublished) (remanding a 2005 Board of Veterans Appeals decision as the board "failed to adequately address the appellant's daily headaches in the context of the criteria for a higher disability rating under DC 8100 ['Migraine']"); Lyden v. Nicholson, 21 Vet. App. 81, 2006 WL 2101337, at *4 (May 2, 2006) (unpublished) (affirming a 2004 Board of Veterans Appeals decision to rate the veteran's post-traumatic migraine headaches as ten percent disabling under DC 8100, "Migraine" (2004 rev.), but remanding to consider further evidence that may increase

the rating). In opposition, defendant cites two unpublished cases, which applied DC 8045, "Brain disease due to trauma," to headaches, but not to migraines. See Schroeder v. Shineski, No. 09-3187, 2011 WL 1534527, at *2 (Vet. App. Apr. 25, 2011) (unpublished) (affirming a Board of Veterans Appeals decision assigning a veteran a ten percent rating under DC 8045, "Brain disease due to trauma" (2007 rev.), for "his purely subjective complaints of headaches and dizziness"); Suber v. Shineski, No 07-3564, 2009 WL 1784072, at *1–3 (Vet. App. June 24, 2009) (unpublished) (affirming a 2007 Board of Veterans Appeals decision assigning a veteran ten percent rating under DC 8045, "Brain disease due to trauma," for post-traumatic headaches).

Although the cases the parties cite are instructive, the court recognizes that according to Rule 30(a) of the current Rules of the United States Court of Appeals for Veterans Claims:

> A party, intervenor, or amicus curiae may not cite as precedent any action designated as nonprecedential by the Court [of Appeals for Veterans Claims] or any other court, or that was withdrawn after having been published in a reporter, except when the cited action has binding or preclusive effect in the case on appeal (such as via the application of the law-of-the-case doctrine). A copy of any unpublished action referred to shall be attached to the document containing the reference.

Rules Ct. App. Vet. Claims 30(a) (Sep. 15, 2011). Moreover, on the first page of each of the decisions cited by both plaintiff and defendant is the phrase "*Pursuant to U.S. Vet. App. R. 30(a), this action may not be cited as precedent.*" (emphasis in original). The language of section 1642 of the Wounded Warrior Act may have altered the general approach for not using unpublished decisions when it mandated the Secretary of the military branch involved to refer to "any applicable interpretation of such schedule [VASRD] by the United States Court of Appeals for Veterans Claims" in making disability determinations. Although unconventional, the phrase "any applicable interpretation" in section 1642 may have implied a broad requirement by military review boards to examine cases by the Court of Appeals for Veterans Claims, including the many unpublished decisions. Published decisions, however, are given more weight by this court.

Moreover, with the exception of Camper v. Mansfield and Lyden v. Nicholson, the other cases presented by plaintiff and defendant discuss more recent versions of 38 C.F.R. § 4.124a that came into effect after plaintiff's separation. The VASRD was amended on December 20, 2005, shortly after plaintiff's separation from the Army on November 21, 2005. While the VA kept the language of DC 8100, "Migraine," the same, the VA altered the text of DC 8045, "Brain disease due to trauma." The note under DC 8045, "Brain disease due to trauma" remained the same as written above. See 38 C.F.R. § 4.124a (2006). A second alternative diagnosis and note was added under DC 8045, namely: "Residuals of traumatic brain injury (TBI)," with many paragraphs of descriptive text following. See id. The court, therefore, is hesitant to apply the VASRD

after it was amended on December 20, 2005, to the extent the decisions reference DC 8045's alternate classification under "Residuals of traumatic brain injury (TBI)." The VA again altered DC 8045, on October 23, 2008, this time more extensively. <u>See</u> DC 8045, "Residuals of traumatic brain injury (TBI)," 38 C.F.R. § 4.124a (2009). Therefore, cases that discuss the VASRD in effect after October 23, 2008 are not helpful.

The court has identified a number of pre-2005 published Court of Appeals for Veterans Claims cases encouraging the application of DC 8100, "Migraine" to veterans who present migraine conditions. In <u>Fenderson v. West</u>, the Court of Appeals for Veterans Claims reviewed a Board of Veterans Appeals determination related to the veteran's "service-connected migraine headaches." <u>See</u> <u>Fenderson v. West</u>, 12 Vet. App. 119, 126 (1999). The court noted, as in Mr. Adams' case, that "[b]ased on the evidence of record from the time of the veteran's application," "there is ample evidence of frequent migraines." <u>Id.</u> at 127. The Court of Appeals for Veterans Claims made clear that "[t]he determination of the level of disability due to service-connected migraine headaches is made under 38 C.F.R. § 4.124a, Diagnostic Code (DC) 8100 (1998) . . . ," although the court in <u>Fenderson</u> did not discuss the application of DC 8045, "Brain disease due to trauma," to plaintiff's condition. <u>See</u> <u>id.</u> at 126; <u>see</u> <u>also</u> <u>Pierce v. Principi</u>, 18 Vet. App. at 442 (discussing a rating of a veteran's migraines under DC 8100, "Migraine"); <u>Barnes v. Derwinski</u>, 1 Vet. App. 288, 289 (1991) (Although the case was remanded to determine a rating, the court noted that "Diagnostic Code 8100 details the disability rating assigned migraine headaches."). This court also identified other unpublished cases from before 2005 that similarly instruct that migraines are to be rated under DC 8100, "Migraine," including <u>Bullard v. Brown</u>, 15 Vet. App. 391, 1997 WL 364047, at *3 (June 27, 1997) (unpublished) (stating that "[m]igraine headaches are rated pursuant to 38 C.F.R. § 4.124a, DC 8100"); <u>Pierce v. Brown</u>, 14 Vet. App. 338, 1995 WL 27305, at *5 (Jan. 24, 1995) (unpublished) (differentiating between "headaches" and "migraines," and noting that "headaches may be service connected only if they are migraines. <u>See</u> 38 C.F.R. § 4.124a, Diagnostic Code 8100 (1994)").

This court, however, found no Court of Appeals for Veterans Claims cases, published or unpublished, in which a veteran whose headaches reached the level of being classified a "migraine" was then rated under DC 8045, "Brain disease due to trauma," or DC 9304, "Dementia due to head trauma," in a manner that negatively affected the veteran.[35] For example, in a published decision, <u>Ashmore v. Derwinski</u>,

---

[35] In another unpublished case, <u>Fulford v. Shinseki</u>, No. 11-1457, 2013 WL 753492 (Vet. App. Feb. 28, 2013) (unpublished), the veteran was diagnosed with migraines by a medical professional, but rated under DC 8045, "Brain disease due to trauma" by the Board of Veterans Appeals. <u>See</u> <u>id.</u> at *2. <u>Fulford</u>, however, is distinguishable from plaintiff's case because it appears the VA and the Board of Veterans Appeals, after a review of the evidence, chose not to classify plaintiff's condition as a migraine condition, but instead as "[s]ervice connection for headaches." <u>See</u> <u>id.</u> at *2–4 (Although the veteran "filed a claim for VA benefits based on service connection for migraine headaches," the VA examinations and ratings determinations generally indicated he had

plaintiff's headaches were rated under DC 8045, "Brain disease due to trauma," although plaintiff's headaches were never classified as a "migraine:"

> Ashmore also stated at his oral hearing that he was suffering from tension headaches, dizziness, and insomnia, all of which he attributed to the concussion he received in the 1954 accident. Unless these statements are inaccurate, or the BVA [Board of Veterans Appeals] finds that these complaints are not symptomatic of Ashmore's 1954 brain trauma (providing reasons or bases, therefor), it would appear that Ashmore is entitled to a 10–percent disability rating under diagnostic code 8045.

Ashmore v. Derwinski, 1 Vet. App. at 583–84 (internal citation removed).

The Court of Appeals for Veterans Claims, in multiple decisions, albeit unpublished, has distinguished migraines from headaches as two separate diseases. In Bullard v. Brown, 1997 WL 364047 (unpublished), the court noted that, in the record, "[t]he headaches were characterized mainly as tension or muscle tension headaches, although probable cluster headaches and migraines were also noted." Id. at *1. The Bullard court concluded that, although "[m]igraine headaches are rated pursuant to 38 C.F.R. § 4.124a, DC 8100," the veteran's "most recent VA examination diagnosed the frequent headaches of which he was then complaining not as migraine headaches, but tension headaches," and therefore rated plaintiff under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma."[36] See Bullard v. Brown, 1997 WL 364047, at *3. In Pierce v. Brown, the Court of Appeals for Veterans Claim reviewed the veteran's record and concluded: "[T]he headaches are secondary to the

"headaches," not "migraines," and he was diagnosed with "Headaches" in his latest, 2009 VA examination.). On the other hand, in the above captioned case, the 2011 PDBR minority and majority decisions both labeled Mr. Adams' unfitting condition specifically as "Post-Concussive Migraine Headaches." In addition, in Fulford, the Court of Appeals for Veterans Claims determined the specific issue was not before the court, see id. at *11, but anyway remanded the case on different grounds to the Board of Veterans Appeals and instructed the Board to rate the veteran under the newer, 2008 version of DC 8045, "Residuals of traumatic brain injury (TBI)," a revised version of the VASRD diagnostic code not applicable to Mr. Adams' case. See id. at *7–8.

[36] In Bullard, the Court of Appeals for Veterans Claims appeared also to refer to a "migraine" condition as a "vascular" headache. See Bullard v. Brown, 1997 WL 364047, at *3. The court stated: "Migraine headaches are rated pursuant to 38 C.F.R. § 4.124a, DC 8100. The Board denied the veteran's claim for a compensable rating for his headaches because the clinical findings did not indicate that the veteran had vascular headaches." Id. As mentioned above, the term "Migraine" is defined in Dorland's Illustrated Medical Dictionary (30th ed. 2003) to cover "vascular headache," under the definition, "an often familial symptom complex of periodic attacks of vascular headache . . . ." See Dorland's Illustrated Medical Dictionary 1158.

occipital neuralgia, and the Court notes that headaches may be service connected only if they are migraines," indicating that migraines are a unique condition, separate from general headaches. Pierce v. Brown, 1995 WL 27305, at *5 (citing DC 8100, "Migraine," 38 C.F.R. § 4.124a (1994)). In Wiley v. Peake, No. 06-0014, 2008 WL 706613 (Vet. App. Feb. 29, 2008) (unpublished), the Court of Appeals for Veterans Claims noted that "[t]he Board [of Veterans Appeals] also acknowledged that 'the record shows persistent complaints of headaches,' but determined that those reports 'fail to suggest migraines or equivalent prostrating attacks of headaches.'" Id. at *2 (referring to a decision by the Board of Veterans Appeals in 2004) (internal citation omitted). The Wiley court remanded to the Board of Veterans Appeals to consider new evidence that challenged the Board's determination that "complaints of worsening symptoms did not rise to the level of migraines or prostrating headache attacks . . . ." Id. at 2–3.

In Johnson v. Peake, a 2008, again unpublished, case, that appears to be somewhat factually similar to plaintiff's situation, the veteran appealed a 2004 Board of Veterans Appeals decision, which diagnosed him with "migraine headaches" after a motor vehicle accident, but then proceeded to rate him "under DC 8045 ('Brain disease due to trauma') and DC 9304 ['Dementia due to head trauma']." See Johnson v. Peake, No. 04-1056, 2008 WL 711884, at *3 (Vet. App. Mar. 12, 2008) (unpublished). According to the court's opinion, "Mr. Johnson argues that the Board erred when it applied 38 C.F.R. § 4.130, Diagnostic Code (DC) 9304 (pertaining to '[d]ementia due to head trauma' and allowing a maximum rating of 10%), rather than analyzing his condition under 38 C.F.R. § 4.124a, DC 8100 (pertaining to '[m]igraine')." Id. The Court of Appeals for Veterans Claims agreed with plaintiff, and stated:

> The Secretary concedes that it is unclear how the Board determined that Mr. Johnson's complaints were "purely subjective" and why the diagnosis of "migraine headaches" fails to warrant a rating under DC 8100, which pertains to migraine headaches. . . . Again, for the reasons articulated by the parties, the Court agrees that the Board's reasons and bases are inadequate for its denial of an initial rating in excess of 10% for migraine headaches, and that claim will also be remanded.

Id. at *3.[37]

---

[37] The court notes that Board of Veterans Appeals decisions are in line with those from the Court of Appeals for Veterans Claims. For example, in BVA No. 92-05 290, 1995 WL 17177429 (Jan. 1, 1995), the Board explored rating a veteran under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma," as well as under DC 8100, "Migraine." See id. at *4. The Board stated that, "in light of the July 1993 rating decision which found that the veteran suffered from migraine headaches due to his post-concussion syndrome, the Board must also consider whether the veteran is entitled to a higher rating under Diagnostic Code 8100 which governs ratings for migraine headaches." Id. The Board awarded the veteran a thirty percent rating under DC 8100, "Migraine." See id. at *5; see also BVA No. 02-04 580, 2003 WL

Reviewing the 2011 PDBR evaluation of Mr. Adams, the minority member in its decision never challenged the medical finding that plaintiff suffered from "migraines," and, in fact, stated in his recommendation that plaintiff suffered from the "**UNFITTING CONDITION**" of "Post-Concussive Migraine Headaches." (capitalization and emphasis in original). Nonetheless, the minority decision treated plaintiff's migraines as if they

---

23630511, at \*6–7 (July 30, 2003) ("Certainly, if the veteran had been diagnosed with migraines, and those migraines had been attributed to his in-service injury, the Board believes that it would be appropriate to consider whether an increased evaluation is available under the criteria of DC 8100."); BVA No. 98-03 729, 1999 WL 33871852, at \*4 (Sept. 7, 1999) (The Board rated plaintiff under the less-often-seen combination DC 8045-8100, "Brain disease due to trauma," analogous to "Migraine," and then awarded the veteran a fifty percent rating under the rating scheme for DC 8100, "Migraine." The Board stated: "As indicated above, Code 8045 ['Brain disease due to trauma'] provides that purely neurological disabilities (determined by the RO [VA regional office] to include migraine headaches) following brain trauma, will be rated under the diagnostic codes specifically dealing with such disabilities, in this case Code 8100, migraine.").

A number of Board of Veterans Appeals decisions have declined to grant a veteran a rating under DC 8100, "Migraine," when the condition did not rise from headaches to the level of "migraine headaches." In BVA No. 98-00 064A, 1999 WL 33859462 (June 7, 1999), the Board chose to assess plaintiff's condition under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma," and refused to characterize plaintiff's "nagging headache[s]" as migraines, stating:

> The Board notes that in the most current VA examination, the examiner diagnosed constant muscle contraction type, low grade headaches, which did not have the characteristics of migraine or vascular headaches. . . . While the current noncompensable rating is based on DC 8100, migraine headaches, it is clear that the headaches should instead be rated under DCs 8045-9304, and a 10 percent rating assigned.

Id. at \*4; see also BVA No. 02-16 367, 2005 WL 3919199, at \*4 (Nov. 1, 2005) ("However, after a review of the evidence, the Board finds that the veteran's disability is most appropriately rated under Diagnostic Code 8045 for brain disease due to trauma as the veteran has not been diagnosed with migraine headaches . . . ."); BVA No. 96-49 971, 2005 WL 3972541, at \*4 (Oct. 5, 2005) ("The evidence of record relevant to this period does not indicate the appellant's headaches had migraine characteristics . . . ."); BVA No. 99-13 870A, 2002 WL 32551243, at \*4 (Sept. 19, 2002) (The veteran's headache condition was rated under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma," as opposed to DC 8100, "Migraine," because the veteran did "not show that the veteran manifests migraine headaches as a residual from her motor vehicle accident.").

were just like any other headache for rating purposes. The minority member, and the Secretary of the Army, when accepting the minority member's decision without further analysis or comment, both failed to address whether the VASRD, as interpreted by the Court of Appeals for Veterans Claims, treats migraines as distinct from headaches. In fact, the Court of Appeals for Veterans Claims has drawn a distinction between the two disease types, which should have been addressed as part of the decision by the Secretary of the Army or the decision of the 2011 PDBR minority member. In addition, the record indicates that neither the Secretary of the Army nor the PDBR majority or minority members at any point considered "any applicable interpretation of such schedule [VASRD] by the United States Court of Appeals for Veterans Claims," when reaching their decisions, in contradiction to the requirements of the Wounded Warrior Act. See Wounded Warrior Act § 1642. The record indicates that the government, therefore, "failed to consider an important aspect of the problem," see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43, for "'consideration of relevant factors.'" See PAI Corp. v. United States, 614 F.3d at 1351 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058). The Army's brief analysis, consisting primarily of the PDBR minority member's less than one page decision, and the one paragraph decision on behalf of the Secretary of the Army, failed to demonstrate the requisite expertise or analysis of important factors contained in the record and in the case law, and the Secretary's decision, therefore, cannot be sustained. See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43.

The 2011 PDBR minority decision's second ground for disagreeing with the majority commendation was: "[E]ven if the 8100 ['Migraine'] rating criteria were conceded, it would be overly speculative to characterize the episodes documented as *prostrating*." (emphasis in original). Under the VASRD definition for DC 8100, "Migraine," to achieve a rating of either ten percent or thirty percent, the migraines must evidence "characteristic prostrating attacks." 38 C.F.R. § 4.124a (2005). For a rating of thirty percent under DC 8100, "Migraine," which is the rating plaintiff sought, and the 2011 PDBR majority recommended, the diagnostic code requires: "characteristic prostrating attacks occurring on an average once a month over last several months." 38 C.F.R. § 4.124a (2005). The minority decision tried to justify its conclusion, that plaintiff's migraines were not prostrating, with the following brief statement:

It was documented that the CI [claimant] was fully employed as a security guard by the VA at the time of permanent separation, and the record is devoid of evidence that the headaches forced cessation of work activities during the rating period (8100 specifies "last several months"). Board precedence, and the more typical VA practice, has been to define 'prostrating' by documented occurrences of the need to abandon work in order to treat the headache.

(emphasis in original).

Plaintiff argues that the record of plaintiff's medical evaluations before the 2011 PDBR did not support the minority member's determination that plaintiff's migraines were not prostrating. Plaintiff points out, for example, that Dr. Garcia, during her TDRL medical review, classified plaintiff's headaches as "**CLASSICAL MIGRAINE (WITH AURA)**: intractable with 1-2 prostrating headachse [sic] a week." (capitalization and emphasis in original). According to plaintiff, for the PDBR minority decision to ignore this relevant information, as well as other medical reports from before and after plaintiff's November 21, 2005 separation from the Army, and instead reflect that the record is "devoid of evidence" of plaintiff's difficulties working, was incorrect. Plaintiff also argues that the minority member created a faulty test for "prostrating." Plaintiff maintains that for a thirty percent disability rating under DC 8100, "Migraine," "prostrating" attacks only have to occur on average once a month over the last several months, and such attacks "do not need to 'force cessation of work activities' or require an individual to 'abandon work' in the first place."

Defendant in response urges the correctness of the 2011 PDBR minority decision's test for prostration, and states that the PDBR minority member and Secretary of the Army "found it more probative that Mr. Adams was fully employed at the time he was permanently separated and concluded that the record was devoid of evidence that his headaches prevented him from working during the rating period." Defendant suggests that "Mr. Adams's disagreement with how the PDBR minority and the Secretary's Designee weighed the facts does not provide a basis for this Court to engage in its own fact-finding concerning the extent of disability." Defendant, however, in a later filing, appears to argue instead that the PDBR minority member was only speaking hypothetically on the issue of whether plaintiff's migraines were "prostrating," and that a remand to the agency could be appropriate:

> [T]he discussion of the severity of Mr. Adams's headaches under Diagnostic Code 8100, ["Migraine"] in effect, addressed a hypothetical scenario because the PDBR minority member did not rate Mr. Adams under that code. Further, even if Mr. Adams could show that the minority member's conclusion – that the evidence was insufficient to establish prostrating headaches at the time of separation – was not adequately supported, this does not prove that the headaches satisfied Diagnostic Code 8100's requirements for a 30 percent rating. Therefore, even if the Court were to overturn the decision to rely upon Diagnostic Code 8045, the appropriate remedy would be to remand the matter for additional analysis.

The court, in military pay cases such as plaintiff's, does not conduct its own fact-finding. See O'Neil v. United States, 6 Cl. Ct. 317, 322 (1984). A review of the record, however, highlights a number of medical reports indicating that plaintiff suffered from "prostrating" migraine attacks near the time of his separation from the Army on November 21, 2005, which interfered with his ability to work, and casts doubt over the agency decision in plaintiff's case. The parties stipulated that after plaintiff was placed

on the TDRL in July of 2004, the VA, on September 1, 2004, characterized plaintiff's condition as including "'frequent, completely prostrating, and prolonged attacks productive of severe economic inadaptability.'" According to the parties, the VA also noted that at that time, plaintiff was "'having migraines at least once a week since your accident in July 2003. Your headaches are relieved with Midrin, rest, and cold compress; and last until you go to sleep.'" The parties further stipulated that Dr. Garcia, during plaintiff's TDRL review on July 18, 2005, just months before plaintiff's October 24, 2005 informal PEB review, diagnosed plaintiff with "'CLASSICAL MIGRAINE (WITH AURA): intractable with 1-2 prostrating headaches a week.'" (capitalization in original). The parties further stipulated that Dr. Garcia also recorded that plaintiff's migraines "'interfere[d] with his quality of life and ability to work,'" and occurred one to two times per week. The record indicates that Dr. Garcia's July 18, 2005, TDRL review examination was the closest medical review in time to plaintiff's October 24, 2005 informal PEB review, which specifically addressed his migraine headache condition. The 2011 PDBR majority decision, although rejected by the Secretary's representative, appeared to give Dr. Garcia's review a higher value than other reviews, and the majority decision stated that "[t]he most influential evidence therefore is that obtained from the TDRL evaluation underpinning the PEB determinations at the time of permanent separation." The record also indicates that the "prostrating" nature of plaintiff's injury appears to have continued after his TDRL review. The parties stipulated that the VA, in plaintiff's September 17, 2009 VA rating decision, took notice of a "'summary of leave requests received March 13, 2008 show[ing] many requests for sick leave due to headaches,'" and also "records showing that 'most of [Mr. Adams's] headaches are prostrating and last up to 24 hours, causing [him] to miss many days of work.'" (modifications in original).

The record further indicates that plaintiff's migraine attacks were severe and required him to cease his activity, including duties within the military. For example, when Dr. Friedman evaluated Mr. Adams on November 18, 2003, a few months after his July 24, 2003 accident, the parties jointly stipulated that "Mr. Adams reported to Dr. Friedman that he had migraines 'at least once a [week]' that 'last until he goes [to sleep],' with an intensity of 8-9 out of 10." (modifications in original). According to the parties' joint stipulation, Dr. Byrnes evaluated plaintiff on April 22, 2004, shortly preceding Mr. Adams' May 5, 2004 informal PEB hearing, and diagnosed him with "debilitating migraine headaches," and indicated in his narrative summary "that the migraines occur 'weekly' and require Mr. Adams 'to leave his duty station, take medication and rest in a darkened room.'" For the 2011 PDBR minority decision to instead state "the record is devoid of evidence that the headaches forced cessation of work activities during the rating period (8100 specifies 'last several months')," "runs counter to the evidence before the agency." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. at 43–44; SKF USA Inc. v. United States, 630 F.3d at 1373 n.3; Verbeck v. United States, 97 Fed. Cl. at 451.

Moreover, the 2011 PDBR minority decision's statement that "Board precedence, and the more typical VA practice, has been to define 'prostrating' by documented

occurrences of the need to abandon work in order to treat the headache," is unsupported in the minority decision. The VA defined "prostrating" in its October 26, 2007 rating decision, which was the first VA rating decision for plaintiff since his separation from the Army on November 21, 2005. The VA stated: "Prostrating attacks of headache are episodes of acute signs and symptoms severe enough to cause extreme weakness and incapacitation which require bed rest and treatment by a physician." The VA definition does not require a need to "abandon work." Moreover, pursuant to the 2005 VASRD, while a fifty percent disability rating under DC 8100, "Migraine," required "very frequent completely prostrating and prolonged attacks productive of severe economic inadaptability," a rating of thirty percent only required "characteristic prostrating attacks occurring on an average once a month over last several months," with no requirement that the migraines resulted in "economic inadaptability." 38 C.F.R. § 4.124a (2005). The inclusion of the phrase "economic inadaptability" in the fifty percent rating, but the lack of the phrase in the thirty percent rating, evidences an intent by the VA that under DC 8100, "Migraine," economic or employment concerns were not to be a prerequisite for a thirty percent disability rating. See Russello v. United States, 464 U.S. at 23. Even if it is assumed that the 2011 PDBR minority decision reflected prior PDBR precedence, a statement for which defendant provided no support, that precedence would still have been improper if the minority decision's approach contradicted the VASRD, or any interpretation of the VASRD by the Court of Appeals for Veterans Claims. See Wounded Warrior Act § 1642. The VASRD states, "[i]n the citation of disabilities on rating sheets, the diagnostic terminology will be that of the medical examiner, with no attempt to translate the terms into schedule nomenclature." 38 C.F.R. § 4.27 (2005); see also DoDI 6040.44, Enclosure 3 §§ 4(d), 5(e)(1) (discouraging the use of military guidance to the extent they "conflict with the VASRD in effect at the time of the contested separation").

Although discussing Board of Veterans Appeals cases, the United States Court of Appeals for Veterans Claims has indicated: "[T]he Board [of Veterans Appeals] may not rely on its own unsubstantiated medical conclusions to reject expert medical evidence in the record; rather, the Board may reject a claimant's medical evidence only on the basis of other independent medical evidence." Flash v. Brown, 8 Vet. App. 332, 339 (1995). The Court of Appeals for Veterans Claims further has instructed that a review board "must support its findings about medical questions with independent medical evidence and may not refute expert medical conclusions based on its own unsubstantiated opinion." Felden v. West, 11 Vet. App. 427, 431 (1998) (citing Colvin v. Derwinski, 1 Vet. App. 171, 174 (1991), rev'd on other grounds, Hodge v. West, 155 F.3d 1356 (Fed. Cir. 1998)); see also Fenderson v. West, 12 Vet. App. at 127 (finding that the veteran had prostrating headaches based on VA medical reports, not on findings that the veteran had to leave work). The Court of Appeals for Veterans Claims has indicated its disapproval of attempts to define key medical terms with self-created Board or personal definitions:

> Lest we be misunderstood, we are not saying that the BVA [Board of Veterans Appeals] was compelled to accept the opinions of Drs. Cohen

and Kassirer. We merely state that having reached a contrary conclusion, it was necessary for the panel to state its reasons for doing so and, more importantly, point to a medical basis other than the panel's own unsubstantiated opinion which supported the decision.

Colvin v. Derwinski, 1 Vet. App. at 175; see also Flash v. Brown, 8 Vet. App. at 339. In plaintiff's case, numerous medical reports contained in the record, including the report by Dr. Garcia on July 18, 2005, the closest report in time to plaintiff's October 24, 2005 informal PEB evaluating his migraine condition, stated that plaintiff's migraine condition was "prostrating." The 2011 PDBR minority member's attempt, instead, "to define 'prostrating' by documented occurrences of the need to abandon work in order to treat the headache," runs counter to VA practice and guidance from the VASRD, see 38 C.F.R. § 4.27 (2005), and evidences a lack of consideration of the issue in favor of a quick, narrow test that inappropriately minimized the role plaintiff's actual medical record should have played in determining whether plaintiff's migraine condition was "prostrating." See PAI Corp. v. United States, 614 F.3d at 1351 (quoting Advanced Data Concepts, Inc. v. United States, 216 F.3d at 1058). The Secretary of the Army's decision to adopt the 2011 PDBR minority decision, without any additional analysis, highlights the cursory nature of the government's review of Mr. Adams' PDBR application. The Secretary of the Army, in adopting the 2011 PDBR minority decision to rate plaintiff, Mr. Adams, under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma," for his "Post-Concussive Migraine Headaches" condition, therefore, made an arbitrary and capricious determination.

Plaintiff argues that because the Secretary of the Army made an arbitrary and capricious determination, and issued the decision without undertaking the requisite analysis or support, the court should vacate Mr. Adams' 2011 PDBR's decision and instruct the Army to set plaintiff's disability rating for his migraines at thirty percent. Plaintiff asserts that this is a permissible action by the court as the record is fully developed and, therefore, "in applying DC 8100 ['Migraine'] to the facts in this case, there is only one permissible view of the evidence of record." (citing Pullman-Standard v. Swint, 456 U.S. 273, 292 (1982) (Reversal, rather than remand, can be appropriate where "the record permits only one resolution of the factual issue.")). Plaintiff also points to a United States Court of Appeals for the Ninth Circuit decision which suggests that the court should adjudicate a disability rating "where the record has been fully developed and where further administrative proceedings would serve no useful purpose," citing Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996). Plaintiff also points to Byron v. Shinseki for the proposition that the general presumption to remand does not apply to "'a case where the agency analyzed the issue in the first instance,'" quoting Byron v. Shinseki 670 F.3d 1203, 1206 (Fed. Cir), reh'g en banc denied (Fed. Cir. 2012), cert. denied, 133 S. Ct. 843 (2013). Plaintiff also reminds the court that occasionally, in the past, Judges of this court's predecessor have made direct ratings decisions, citing Ferrell v. United States, 23 Cl. Ct. 562, 572 (1991), Wolf v. United States, 168 Ct. Cl. 24, 32 (1964), and Hordechuck v. United States, 144 Ct. Cl. 492, 499 (1959).

Plaintiff incorrectly points to <u>Byron v. Shinseki</u> in arguing that the general presumption to remand does not apply to "'a case where the agency analyzed the issue in the first instance.'" (quoting <u>Byron v. Shinseki</u>, 670 F.3d at 1206). The Federal Circuit in <u>Byron</u> affirmed a Court of Appeals for Veterans Claims decision to remand a case for further proceedings back to the Board of Veterans Appeals, stating:

> It is not enough that only a few factual findings remain or that the applicant may have a strong case on the merits. None of the rare circumstances found in the cases cited by Ms. Byron from other circuits is present in the current case.
>
> . . .
>
> It is not enough for Ms. Byron to claim that all of the evidence of record supports her position. The Board must still make an initial determination of whether Ms. Byron has sufficiently supported a claim for an earlier effective date. It may well be that the Board concludes that Ms. Byron has established these facts. That, however, is precisely what needs to be done by the fact-finding agency in the first instance, not by a court of appeals.

<u>Byron v. Shinseki</u>, 670 F.3d at 1206.

In addition, defendant, quoting from <u>O'Neil v. United States</u>, 6 Cl. Ct. at 322, correctly maintains that this court "'does not sit as a finder of fact, but rather has a very limited scope of review with respect to decisions of the'" necessary board. Defendant, quoting <u>Towne v. United States</u>, 106 Fed. Cl. at 707, also emphasizes that in cases in which the agency has been less than clear in their explanations, "'the courts have remanded the matter to the agency for additional explanation or investigation.'" This court is not a "'super correction board'" even if it feels a correction is appropriate. <u>See Van Cleave v. United States</u>, 70 Fed. Cl. at 678 (quoting <u>Skinner v. United States</u>, 219 Ct. Cl. at 330). Although the PDBR minority member's decision is unsupported by the record, a new PDBR should be given a proper opportunity to carefully review Mr. Adams' factual medical record, in order to consider, based on the medical facts, whether plaintiff's migraine condition "satisfied Diagnostic Code 8100's requirements for a 30 percent rating." "[T]he court will not guess what the agency had in mind, particularly, where review of the evaluation process reveals multiple errors in the agency's decisional path." <u>CRAssociates, Inc. v. United States</u>, 95 Fed. Cl. 357, 384 (2010).[38]

---

[38] Although in an earlier status conference with the parties, defendant indicated that remand of Mr. Adams' case was not warranted, defendant indicated in later filings with this court that it now might be amenable to a remand of the case for another review by the PDBR and the Secretary of the Army.

**CONCLUSION**

The Secretary of the Army, in adopting the 2011 PDBR minority decision to rate Mr. Adams' "Post-Concussive Migraine Headaches" condition under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma," made an arbitrary and capricious determination, and issued the decision without undertaking adequate analysis or support. Under section 1642 of the Wounded Warrior Act, the Secretary of the Army also should have considered "any applicable interpretation of such schedule [VASRD] by the United States Court of Appeals for Veterans Claims," to determine whether plaintiff's migraine condition should have been rated under DC 8045-9304, "Brain disease due to trauma," analogous to "Dementia due to head trauma," or DC 8100, "Migraine." A review of United States Court of Appeals for Veterans Claims case law suggests that migraine is a distinct medical condition from headache, and, therefore, a service member with a migraine condition should be rated under DC 8100, "Migraine." Moreover, the determination by the Secretary of the Army, adopting the 2011 PDBR minority decision that plaintiff's migraines were not "prostrating," was also incorrect. In coming to this determination, the minority decision did not take into account plaintiff's medical reports, and, additionally, created a separate test for whether a headache is or is not prostrating, without any evidence that this test was appropriate under the VASRD. The Secretary of the Army, in adopting the minority decision without any further explanation, acted arbitrarily, capriciously, without substantial evidence, and contrary to law. For the foregoing reasons, plaintiff's motion for judgment on the administrative record is **GRANTED IN PART**, and defendant's cross-motion for judgment on the administrative record is **DENIED**. The case is **REMANDED** to the Secretary of the Army to act in accordance with this opinion, and to have plaintiff's case expeditiously reviewed by a PDBR.

**IT IS SO ORDERED.**

<u>**s/Marian Blank Horn**</u>
**MARIAN BLANK HORN**
**Judge**